UNITED STATES FIDELITY & GUARAN-
TY COMPANY, a corporation,
Plaintiff-Appellant,

v.

SAFECO INSURANCE COMPANY OF
AMERICA, a corporation, Defendant;
Cross-claimant, Cross-Defendant, Appel-
lant,

Robert Allan Alonzo, by Joseph C. Alonzo,
his next friend, and Joseph C. Alonzo,
Defendants, Cross-Defendants, Cross-claim-
ants, Respondents,

Deborah Norman, a minor, and Donald R.
Norman, Defendants, Cross-Defendants
Appellants.

No. 58437.

Supreme Court of Missouri,
En Banc.

April 14, 1975.

Rehearing Denied May 12, 1975.

George E. Lee, Doris J. Banta, St. Louis, for appellant; Carter, Bull, Baer, Presberg & Lee, St. Louis, of counsel.

C. Marshall, Friedman, Gray, Friedman & Ritter, St. Louis, for respondents Alonzo.

F. X. Cleary, J. C. Jaeckel, Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, St. Louis, for appellant-respondent, etc.

David G. Dempsey, Clayton, James F. Koester, St. Louis, for respondents-appellants, Deborah Norman and Donald R. Norman.

SEILER, Judge.

These appeals (which reach the writer on reassignment) follow a declaratory judgment action which seeks a determination of which automobile liability insurer owes what under the omnibus clause coverage in one policy and the non-owned automobile clause coverage in the other. An opinion was handed down by the court of appeals, St. Louis District. That court thereafter overruled motions for rehearing but because of the general interest and importance of the questions involved and for the purpose of reexamining the existing law relative to the issues presented, sustained the motions of the insurers to transfer the cause here. We will consider it as though the appeals were properly here in the first instance. Art. V., Sec. 10, 1945 Constitution, V.A.M.S.

There was a one-car accident in St. Louis on Friday night, January 16, 1970. Roy Chapman, age 17, was driving the automobile, a 1965 Dodge Dart owned by Mrs. Dorothy Kloepper. Mrs. Kloepper was not in the car. Mrs. Kloepper's daughter, Jane, age 17, was riding in the rear seat with Robert Alonzo, age 18. Deborah Norman, about the same age as Jane, was riding in the front seat. The four, who were high school students, friends of several years standing, were on their way to a pizza parlor. Robert Alonzo and Deborah Norman were injured and have recovered judgments for their injuries, and Alonzo's parents have recovered for loss of services.[1] United States Fidelity & Guaranty Company (hereinafter referred to as U.S.F. & G.) had issued its family automobile policy to Dorothy Kloepper as the named insured on the Dodge Dart automobile. Safeco Insurance Company of America (hereinafter referred to as Safeco) has issued its automobile liability policy to James A. Chapman, father of Roy Chapman, on Mr. Chapman's automobile, a Ford. This policy provided coverage under defined circumstances for the operation of a non-owned automobile.

The initial question is whether Roy Chapman was covered under the U.S.F. & G. omnibus clause, which reads as follows:

"The following are Insureds under Part I:

(a) with respect to the owned automobile,

(1) the Named Insured and any resident of the same household.

(2) any person using such automobile with the permission of the Named Insured, providing his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission . . ."

and under the non-owned automobile clause of the Safeco policy which reads as follows:

"The following are insureds under the Liability Section:
" . . .

(b) With respect to a non-owned automobile,

(1) the named insured,

(2) any relative, but only with respect to a private passenger automobile . . . provided . . . his actual operation or (if he is not operating) the other actual use thereof is with the permission, or reasonably believed to be with the permission, of the owner and is within the scope of such permission . . ."

---

1. Robert Alonzo's judgment against Roy Chapman was for $87,500. His father's for loss of services was $18,500. Deborah Norman's judgment against Chapman was for $45,000. There were no appeals.

There are other questions in the case, but the above must be resolved first of all.

The question of whether there is coverage under the omnibus clause has often been before our courts. Every case requires a factual determination of whether a grant of permission by the named insured to the first permittee impliedly authorizes the first permittee to allow another to operate or use the automobile, thus making the second permittee an additional insured within the terms of the policy. St. Paul Insurance Company v. Carlyle, 428 S.W.2d 753 (Mo.App.1968). This could be avoided by holding that "once the initial permission has been given by the named insured, coverage is fixed, barring theft or the like", Odolecki v. Hartford Acc. & Indem. Co., 55 N.J. 542, 264 A.2d 38, 42 (1970), but that is not the way the insurance policy is written.

It has been suggested that the trend of the times is for people to be compensated for automobile accidents and the omnibus clause, therefore, should be broadened accordingly when a question of its coverage arises. Frequently, the existence of safety responsibility acts and uninsured motorist statutes are said to work a broadening of coverage. But the argument is not persuasive here. To begin with, there is no indication that either of the policies before us was purchased in order to comply with Secs. 303.160–180, RSMo 1969, V.A.M.S., of the Motor Vehicle Safety Responsibility Law, and furthermore, the legislature has made no requirement that in order to operate a motor vehicle in Missouri that the driver must have liability coverage. All that is required is that if a driver has an accident of a certain seriousness, then, to avoid automatic suspension of his driving license, he must either present a release or post security unless he can show the existence of an insurance policy of described limits, Sec. 303.030, RSMo 1969. And even the kind of liability insurance policy which the legislature has prescribed will be accepted as proof of financial responsibility, Sec. 303.190, subd. 2(2), RSMo 1969, has an omnibus clause which requires "express or implied permission of such named insured." Sec. 379.203, RSMo 1969, requiring Missouri automobile liability insurance policies to include uninsured motorist coverage does not purport to change the wording of the omnibus clause or its coverage in the policies. So there is no way we can avoid the determination of whether the implied permission given by Mrs. Kloepper to Jane extended to Jane's letting someone drive the car, within the terms of the omnibus clause as it is written in the policy before us. See also Helmkamp v. American Family Mutual Insurance Co., 407 S.W.2d 559, 572–73 (Mo.App.1966).

On the particular evening in question Jane asked to use the car and Mrs. Kloepper said yes. It was her understanding that Jane was going bowling with Deborah. From the bowling alley, Jane and Deborah drove by Roy Chapman's house and he went with them to a sandwich drive-in. They left the drive-in once, then returned, and Jane went inside. Chapman got behind the steering wheel. Jane came back to the car, saying she wanted to find Bob Alonzo, who was supposed to be at a party in the area. Chapman said he knew the way and Jane asked him if he would drive. From then on, Chapman was the driver. Eventually they returned to the drive-in and this time found Alonzo there. The four then started out with no particular destination, but sort of planning to go to a pizza place. Enroute, Chapman ran off the road and hit a tree.

Jane Kloepper testified she was aware Roy had consumed six cans of beer and had beer in the car. Chapman, however, denied having anything to drink. Robert Alonzo claimed to have no recollection of events of the evening prior to the accident

and Deborah Norman did not testify. The police report was silent on drinking.[2]

Mrs. Kloepper purchased the automobile in 1965. Her daughter, Jane, at that time was age 13. In due course Jane took driving lessons and obtained her license in August, 1968, a few months after her sixteenth birthday. She started using the car to go to her friends' homes and parties. When Jane started driving Mrs. Kloepper instructed her not to let others drive the car. On one occasion she gave permission to allow two girl friends to drive when Jane's eyes were irritated. When asked whether there was any time "you ever gave her other instructions or authority other than that", she replied "No, sir." Mrs. Kloepper never saw Roy Chapman drive the car, never knew that others had driven it. She admitted that Jane had a set of keys and used the car more than she did. She did not disagree with Jane's testimony that Jane used it about 75% of the time.

Jane testified that she used the Dodge to attend parties, dances and "stuff like that." She did not remember her mother telling her she could or should let others drive, but in a deposition given in November 1970 admitted her mother said "I shouldn't let anyone drive" at the time she started driving and "a couple of months ago." She did permit others to drive, however, and estimated at least six other friends had driven the vehicle. Robert Alonzo stated that Jane referred to the automobile as "her car." He corroborated that Jane had her own set of keys and permitted others to drive. Chapman conceded he did not in fact know who owned the car, but he thought it was Jane's, that Jane referred to it as her car. Chapman also knew that Jane let others drive the car.

Since the question is whether Chapman is within the omnibus coverage of the U. S.F. & G. policy, it must be determined whether Chapman was using the automobile "with the permission" of Mrs. Kloepper, the named insured, with his actual operation of it being within the scope of such permission. Jane Kloepper was using the automobile (she was riding in it, which is a use of the automobile) and while she was not operating it, her actual use of the automobile at the time—going to a place to get pizza—was well within the scope of the broad permission she had from her mother to use the car in her social activities with her high school friends and classmates.

Mrs. Kloepper was not aware Chapman was driving the automobile and was barely aware of his existence. She was, however, aware that Jane had numerous friends her own age, that while Jane and she both used the automobile, most of the time it was Jane's car; that Jane had the car on this particular evening for social purposes; and as the mother of a teenage daughter with an automobile it would be reasonable for Mrs. Kloepper to anticipate that her daughter, when in the company of boys her own age on social outings, might ask or permit the boys to do the driving.

If it is necessary that Mrs. Kloepper have actual knowledge that Chapman was in fact driving the automobile, then, of course, the conditions of the omnibus clause would not be met, because this knowledge is lacking in the case before us. But is it essential that Mrs. Kloepper know of Chapman and that he was driving? The omnibus clause refers to "any person", which is broad enough to include unknown persons. The person must be using the vehicle with the permission of the named insured, but certainly Mrs. Kloepper could

2. It is argued that Mrs. Kloepper would never have given permission for Jane to permit someone who had been drinking to drive the car. However, the wisdom of Mrs. Kloepper's implied permission is not an issue. The question is how broad was the implied permission. This must be determined by judging from Mrs. Kloepper's objective conduct the scope of the implied permission, not subjectively as to what Mrs. Kloepper may have thought to herself.

give permission to a class of unknowns to use her car—such as, for example, anyone Jane asked to drive the car. The actual operation or driving of the car would have to be within the scope of Mrs. Kloepper's permission, but this would be the case if the unknown were using the car for a purpose which was within the scope of the use Mrs. Kloepper authorized Jane to make. If the person driving the car were one whom Jane asked to drive and the driving was being done on the same sort of mission, objective or purpose for which she otherwise would have done the driving herself as part of her use of the car for a social evening, then it would be within the scope of the permission.

■ The trial court ruled that at the time of the collision Chapman was operating the Kloepper vehicle with the implied permission of Mrs. Kloepper. What evidence supports this? Jane used the automobile 75% of the time and had her own set of keys. She referred to the car as hers. Usually Jane drove it to visit friends, attend parties or go shopping. She used it for shopping for her mother. Jane permitted numerous others to drive the car. The car was there for her to use "if she had errands and things to run, yes." It was an exceedingly loose arrangement between mother and daughter as to the car and the limitations on its use. Mrs. Kloepper obviously placed a good deal of trust in her daughter, as well as being rather indifferent as to what Jane did with the car. With Mrs. Kloepper as indulgent and complaisant as she was toward her daughter and the automobile, paying for maintenance and repairs of the car, providing most of the gasoline and oil, paying the additional premium required for coverage of a teenage driver, apparently letting Jane use the car whenever she wanted to and with no indication that she ever denied the car to her daughter, it is not a strained conclusion to draw that Jane was granted a "broad and unfettered" use or dominion over the car and, if so, this would include letting someone else drive it

when Jane considered it appropriate to the use Jane was authorized to make of the automobile.

Jane was a few months past 16 when she first started driving. She was not quite 18 at the time of the accident. Mrs. Kloepper testified that when Jane first started driving her instruction was not to let anyone drive the car. In response to a question as to whether she had occasion to talk with her daughter again about it Mrs. Kloepper answered, "On one occasion we talked about it" and related the time when Jane was having trouble with a new set of contact lenses and Mrs. Kloepper said one of two particular girls could drive her home from the doctor's office. There was no other time she gave Jane instructions as to whether she should or should not let anyone else drive the car.

With a 17 year old daughter, a parent needs to be more specific in restrictions about the automobile if the daughter is expected to act with restraint. At 16 or 17 having an automobile means a girl "has a lot going for her" and if she is the only one in the crowd with a car on a particular evening, the girl is apt to take a lot of liberties with it—fooling around, running back and forth looking for people, going to hamburger and pizza establishments, and embarking on similar expeditions. If there are to be restrictions, to be effective they must be more than vagaries, which is all Mrs. Kloepper imposed at best. The restrictions must be explicit. If not, a parent can expect a car to be used with great liberty. The accident was on a week-end night—a Friday—and although Jane said they were going bowling (and they did so), it is safe to say that neither she nor her mother expected the evening's activities would end there.

U.S.F. & G. relies on a number of recent decisions which deny coverage under the omnibus clause to a second permittee and urges that there was no evidence to support the trial court's finding that Mrs. Kloepper had impliedly authorized Jane to

grant Roy Chapman permission to operate the automobile. Government Employees Ins. Co. v. Lammert, 483 S.W.2d 652 (Mo. App.1972); Allstate Ins. Co. v. Hartford Acc. & Indem. Co., 486 S.W.2d 38 (Mo. App.1972); St. Paul Ins. Co. v. Carlyle, supra; Helmkamp v. American Family Mut. Ins. Co., supra; M. F. A. Mut. Ins. Co. v. Alexander, 361 S.W.2d 171 (Mo.App. 1962); Varble v. Stanley, 306 S.W.2d 662 (Mo.App.1957).

None of these decisions controls this proceeding. Factually, each is distinguishable from this case. In Lammert, the son who gave permission to another was required to inform the father, the insured, whenever he was going to use the automobile; the son never used the car for social purposes and there was no "unfettered and unrestricted" control of the automobile given by the insured.

In Carlyle, the son, who had given permission to another, did not have a set of keys given to him by the insured, his father; the permission to use the auto was requested and renewed in each instance; the son did not have "free and unfettered dominion over the car."

In Helmkamp, the son of the insured was permitted to take the car less than twice a week on the average and his parents did not "turn him loose"; he was required to tell them where he was going, park the car, and be home by eleven. Before the accident the son never gave anyone permission to drive the car.

In Alexander, the son drove the car only after obtaining specific permission on each occasion; he did not have the right to drive the car anytime he wanted to and the father was strict in limiting its use to a particular place.

In Varble, there was no evidence of permission at all.

In Allstate Ins. Co. v. Hartford Acc. & Indem. Co., supra at 46, the court stated that " . . . it may not fairly and reasonably be inferred and found . . .

that [the first permittee] had permission, unrestricted in scope and range, to use her mother's automobile at any and all times." Further, in the Allstate case it is pretty clear that had it been all right for the daughter to permit her friend to drive, the daughter (who was between 21 and 22 years of age) when she called her mother from Cape Girardeau to reassure her because it was getting late, starting to rain, and the daughter still had to return from Cape Girardeau to Lilbourn, a distance of fifty miles or more, would have mentioned that there was a young man with her who would help with the driving. In addition, the testimony was that the daughter always asked her mother about taking the car and "if it was agreeable" she took the car and if she drove the car more or less than she intended to do, would always inform her mother, which indicates that her use of the car was considerably more restricted than that permitted the daughter in the present case. Finally, there was no reason for the mother to anticipate that the daughter, who left the house around 1:30 p.m. to do various personal errands, would be in a social situation where it could be foreseen, as for example with the daughter in the present case, that someone else might end up driving.

We have found only one Missouri case where coverage was extended to a second permittee: Haynes v. Linder, 323 S.W.2d 505 (Mo.App.1959). Haynes, however, is a clear cut case, because there the named insured was informed by his first permittee, Gardner, that Gardner had turned the automobile over to the second permittee, Linder, who was driving it and the insured said this was all right. Subsequently the second permittee was involved in an accident with the car and the court held he was covered under the omnibus clause of the named insured's policy.

In all other Missouri cases which we have found, coverage has been denied the second permittee. These, in addition to the six cases cited by U.S.F. & G., supra, are Farm Bureau Mut. Ins. Co. v. Dryden, 492

S.W.2d 392 (Mo.App.1973); Nye v. James, 373 S.W.2d 655 (Mo.App.1963) and M. F. A. Ins. Co. v. Lawson, 336 S.W.2d 123 (Mo.App.1960). None of these cases has a factual situation similar to ours.

There is evidence Mrs. Kloepper gave her daughter instructions not to let others drive the car when the daughter first started driving, but at the time of the accident, a year and a half later, the daughter had, with the permission of her mother, broad, free and unfettered control of the vehicle to such an extent that it can be concluded, from the objective manifestations, that Mrs. Kloepper gave implied permission to Jane Kloepper to permit others to operate the vehicle when Jane was in the car and it was being used for purposes which Jane was authorized to make of it. The implied permission is found not from permission granted when Jane first started driving but from the subsequent conduct of the named insured and her daughter. However, as said in Teague v. Tate, 213 Tenn. 269, 375 S.W.2d 840, 844 (1964), we do not " . . . intend to lay down the rule that will license the first permittee to select a second permittee who will, in all cases, become an additional insured. Each case should be considered on the facts presented."

■ We therefore hold as follows on the question of whether a second permittee is covered under the usual omnibus clause such as we have here:

1. The permission must come from the named insured, not simply from the first permittee.

2. Permission of the named insured to the second permittee may be implied as well as express.

3. Permission may be proven by circumstantial evidence, but the circumstances must be such that the necessary fact may be inferred therefrom and must reasonably follow, so that the conclusion so reached is not the result of guesswork, conjecture or speculation.

4. Permission from the named insured can be found or implied from a course of conduct which evidences the willingness of the named insured to permit the first permittee to authorize others to drive, such as the broad and unrestricted use given by the named insured to her daughter in this case.

Thus we believe there was sufficient evidence for the trial court to reach the conclusion that there was the requisite implied permission by Dorothy Kloepper and we cannot confidently say otherwise. It follows, then, that Roy Chapman was an insured under the omnibus clause of the U. S.F. & G. policy.

Turning now to Safeco and the question of whether Roy Chapman is covered under the non-owned automobile provisions of his father's policy, the terms of which are set out earlier herein:

In State Farm Mut. Ins. Co. v. MFA Mut. Ins. Co., 485 S.W.2d 397 (Mo. banc 1972) this court held that the term "ownership" as appearing in the "Automatic Insurance for Newly Acquired Automobiles" provisions of the standard automobile liability policy meant that for the insured to "acquire ownership" there must have been strict compliance with the requirements of Sec. 301.210, RSMo 1969. In that case, the title papers were all in order except that the written assignment of the title certificate was not notarized, so the purchaser did not "acquire ownership" of the pickup truck. In National Indem. Co. v. Liberty Mutual Ins. Co., 513 S.W.2d 461 (Mo. 1974), the court relaxed the requirement of strict compliance with Sec. 301.210, supra, where questions of insurance coverage were concerned, to hold that there could be a constructive delivery of the assigned certificate of title to the purchaser. In that case the certificate of title was signed and notarized, but instead of being delivered to the purchaser as required by Sec. 301.210, it was delivered by the seller to the finance company. The court concluded the vehicle was nevertheless "owned" by the purchaser so far as insurance was concerned.

In the case before us there is no question of compliance with the Missouri statute on ownership of a motor vehicle and no sale of the vehicle is involved. Mrs. Kloepper purchased the car when her daughter was only 13 years of age. No one contends that Mrs. Kloepper does not have full legal title to the vehicle under the Missouri statute. The only question is what is the meaning of "owner" as used in the non-owned automobile clause of the Safeco policy. Does it mean no one other than the person who is named in the Missouri certificate of title?

As has been pointed out by other courts (see Carlsson v. Pennsylvania General Insurance Co., 214 Pa.Super. 479, 257 A.2d 861, 864 (1969)), early non-owned automobile clauses simply provided coverage with respect to any relative of the named insured who was driving a non-owned automobile, without any requirement as to having permission to drive from the owner. Cases then arose where children of insured persons stole automobiles and were involved in accidents. There would be no coverage under the omnibus clause in the owner's policy but in such cases the court held that the non-owned automobile coverage in the policies of their parents did afford coverage. The predictable outcome, of course, was that insurers added limitations as to consent, so that they would not be liable for injuries caused by persons driving stolen automobiles.

■ It is clear at the outset that actual express permission of the owner is not required because the policy uses the words "reasonably believed to be with the permission". This has reference to what could reasonably be believed by the driver as to whether he had permission of the owner.

■ If Jane Kloepper were the "owner" of the Dodge Dart within the meaning of the term "owner" as used in the Safeco policy, then certainly Roy Chapman had her permission to drive the car. The indications are that Roy Chapman thought Jane Kloepper was the owner. But even if Jane Kloepper were not the owner of the car within the meaning of the term as used in the Safeco policy, nevertheless Roy Chapman, under the facts and circumstances already set forth, would be reasonable in believing that whoever owned the car had put the possession in Jane with such freedom of action available to Jane in its use that if Jane gave permission to use the car it would be tantamount to the owner giving permission.

While Jane Kloepper was not the "owner" of the Dodge Dart in the sense of having a Missouri certificate of title in her name, she was the "owner" insofar as she had possession, control and dominion over the automobile most of the time and she was capable of transferring lawful possession of the automobile to Roy Chapman. Under the circumstances in the present case, for example, Roy Chapman could not be found guilty of tampering with the Dodge Dart in violation of Sec. 560.175, RSMo 1969, which prohibits persons driving, operating, using, or tampering with a motor vehicle without the permission of the owner thereof. While Roy Chapman would be liable to Mrs. Kloepper for damage to the vehicle caused by his negligence while it was in his possession as a bailee, Mrs. Kloepper would not be able to contend successfully that Roy Chapman was guilty of conversion of the automobile or guilty of some sort of trespass by virtue of the fact that he was driving the automobile on the occasion in question.

■ It is true that plain language in an insurance policy is not to be used to create an ambiguity where in the context of the use and application of a term none exists, but it is also established beyond question that where an insurance policy is reasonably susceptible to two or more meanings, the ambiguity will be resolved in favor of the insured.

The word "owner" is not defined in the Safeco policy and it is a word of rather broad meaning. In Powell v. Home Indem. Co., 343 F.2d 856 (8th Cir. 1965), a

case involving Missouri law, the court considered the meaning of the word "owner" in an automobile liability insurance policy and said, at 859:

"The trial court in construing the word 'owner' must take the meaning most favorable to the insured . . . The plain and reasonable meaning of the word as applied to motor vehicles includes not only absolute estates but also includes estates less than absolute . . ." See also 73 C.J.S. Property § 13(a), p. 181: "The term 'owner' is a general term having a wide variety of meanings depending on the context and the circumstances in which it is used. Broadly, an 'owner' is one who has dominion over property which is the subject of ownership." Further, id. at p. 183: "The term 'owner' may also be synonymous with 'holder' or 'possessor' . . ." And see, further, State ex rel. Thompson-Stearns-Roger v. Schaffner, 489 S.W.2d 207, 215 (Mo.1973), where the court was concerned with the meaning of "ownership" and "title" and said: "The term 'ownership' cannot be said to have a fixed, definite meaning . . . According to Black's New Dictionary (Rev. 4th ed.), the word 'Owner' 'is not infrequently used to describe one who has dominion or control over a thing, the title to which is in another.' "

The use which Chapman was making of Mrs. Kloepper's automobile was not the type of unauthorized use such as stealing or trespassing which the insurers were seeking to eliminate from their coverage when they modified the non-owned clause to add the requirement of permission from the owner. If it is true that "owner" is ambiguous as used in the insurance policy, then it certainly would include Jane Kloepper, who could be regarded as owner in the sense of one who had possession and dominion over the car. But even if "owner" means no one other than the person who has the Missouri certificate of title,[3] then

it can reasonably be said that Chapman had Mrs. Kloepper's permission or at least he could reasonably have believed that he had permission of whoever owned the car if Jane Kloepper did not, because of the way Jane Kloepper was permitted to use the car.

The conclusion which we reach, then, is that Roy Chapman was also covered under the non-owned automobile portion of the Safeco policy.

We come now to some other contentions which first require a further statement of facts.

As stated, Joseph C. Alonzo and his son Robert filed suit to recover damages against Roy and Jane. U.S.F. & G. informed Chapman in a letter dated August 5, 1970, that it would assume the defense in the Alonzo and Norman suits, but in so doing would not waive the right to deny coverage. On October 7, 1970, the attorney for U.S.F. & G. withdrew as counsel for Chapman and William R. Gartenberg was then retained.

Gartenberg made several efforts to convince Safeco to assume the defense of Roy under the liability policy which afforded coverage to James Chapman and the members of his family. In a letter dated November 12, 1970, Gartenberg informed Safeco that he believed it was responsible for Chapman's defense. Safeco responded on November 25, 1970, and declined to assume the defense pending the adjudication of the declaratory judgment action brought by U.S.F. & G. Gartenberg informed Safeco that he was forced to assume Chapman's defense. On June 7, 1971, Gartenberg informed Safeco that the Alonzo case had been assigned out to trial, that plaintiffs were willing to settle the case within the limits of the policy, and requested Safeco to assume the defense under the non-waiver clause.

3. It is significant that Safeco did not see fit to define owner as being only the person who had the legal certificate of title, which it could easily have done had that been its position.

Trial of the Alonzos' suit commenced June 8, 1971. A few days before, Gartenberg qualified as Roy's guardian ad litem.

During the trial and prior to the close of the plaintiffs' case, U.S.F. & G., Jane, and Marshall Friedman, attorney for the Alonzos, agreed upon a settlement of $12,500 as to Jane's liability and the trial court sustained a motion for a directed verdict on behalf of Jane Kloepper at the close of the plaintiffs' case. Also during the trial, a statutory agreement pursuant to Sec. 537.065, RSMo 1969, was entered into between the Alonzos, Roy Chapman, William Gartenberg and Maude Chapman, mother of Roy. By the agreement Chapman admitted liability. and the Alonzos agreed that execution would not be levied on Chapman but " . . . against only Safeco Insurance Company and United States Fidelity and Guarantee [sic] Company, Corporations, or their successors." Gartenberg made an admission of liability before the jury and offered no evidence in defense. Mr. Friedman, without objection by Gartenberg, made a closing argument in which he told the jury not to consider where the money was going to come from to pay for the verdict, that there were "substantial sources from which the money will come" and advised the jury not to "take that into consideration at all."[4] The attorney for U.S.F. & G. observed the proceedings up until closing arguments and the attorney for Safeco was present during the litigation.

The jury awarded Robert Alonzo damages in the sum of $100,000 and Joseph the sum of $25,000, subsequently reduced by voluntary remittiturs to $87,500 and $18,500 respectively, the amounts sued for.

Safeco urges that the verdicts and judgments in favor of the Alonzos against Roy Chapman were based on an admission of liability pursuant to the written agreement entered into by Roy's guardian and attorney, Gartenberg, and Roy and his mother. That agreement, Safeco contends, was in disregard of the duties of the guardian; that under the agreement the proceedings were not adversary in nature and since Gartenberg sat silent while the attorney for the Alonzos made improper statements in argument, the verdicts and judgments obtained were "tainted with collusion and fraud" and should not be permitted to stand against Safeco even if we find that the Safeco policy extended coverage to Roy Chapman.

On the other hand, the Alonzos contend that Safeco was obligated to defend the Alonzos' suit, was requested "to assume the defense of the Alonzo suit under a reservation of rights", was "present when the case was assigned for trial", was "afforded every opportunity to assume the defense", and is bound by the results thereof. Under such circumstances and having exhausted efforts to have Safeco assume the defense, it is said the conduct of Gartenberg was in the exercise of his duty for the protection and best interests of his client, Roy Chapman.

Sec. 537.065, RSMo 1969, has not been the subject of many decisions, but an agreement authorized by this section has been upheld.[5] In Eakins v. Burton, 423 S.

4. Such argument was improper and censurable. Rytersky v. O'Brine, 335 Mo. 22, 70 S.W.2d 538 (1934); Murphy v. Graves, 294 S.W.2d 29 (Mo.1956).

However, suppose Safeco had been defending the case and had permitted the argument to have been made without objection and had taken no appeal. Safeco would be in no position to complain, on execution, about the argument.

5. The section provides, in part, as follows: "Any person having an unliquidated claim for damages against a tortfeasor . . .

may enter into a contract with such tortfeasor or any insurer in his behalf or both, whereby, in consideration of the payment of a specified amount, the person asserting the claim agrees that in the event of a judgment against the tortfeasor, neither he . . . [nor others claiming by him] . . . will levy execution, by garnishment or as otherwise provided by law . . . except against any insurer which insures the legal liability of the tortfeasor for such from execution, garnishment or other legal damage and which insurer is not excepted procedure by such contract."

W.2d 787, 790 (Mo.1968), such an agreement was entered into and the insurance company, having refused to defend, contended that the defendant made a wrongful use of the section because the ". . . agreement dispensed with the necessity of defendant making a defense to plaintiffs' claims in order to protect his personal interests." This court saw "no merit" in that contention. "The contract was of a type expressly authorized by the statute . . . [I]n the event plaintiffs seek to collect the instant judgments . . . [the insurance company] will have an opportunity to litigate the question of its liability on its policy."

■■■ The precise question that we must resolve and the one which Safeco relies on in its brief is whether the agreement admitting liability on the part of Chapman and the inaction on the part of Gartenberg during the Alonzo arguments were so tainted that the verdicts and judgments in favor of the Alonzos cannot stand. We hold, as did the trial court, that the verdicts and judgments obtained were not obtained fraudulently or collusively.

There is no question that Safeco was notified of the Alonzo suit, was requested to assume the defense thereof, and requested to defend under a reservation of rights. Safeco consistently declined to do so. Having failed to induce Safeco to assume the defense, Gartenberg entered into the agreement, acting in his capacity as guardian and attorney for Chapman and owing him the highest fealty. Gartenberg discussed the facts with his clients; he felt that the jury was favorable to the plaintiffs and expected verdicts in excess of the policy limits. Under the circumstances, Gartenberg's primary concern was to protect his ward since Safeco declined to defend.

Safeco, having been notified of the Alonzo action and having been requested to defend the Chapman suit but refusing to do so, placed Gartenberg in the position of protecting his ward. Gartenberg, in sitting silent, was not guilty of fraud under the facts. There is no claim or evidence that Gartenberg agreed in advance as to the argument or that he knew it was coming.

Safeco quotes from Tracy v. Martin, 363 Mo. 108, 249 S.W.2d 321, 323 (banc 1952) that ". . . It is the duty of the guardian ad litem to defend the suit. He cannot admit or waive anything which goes to sustain the claim of the adverse party . . ." In the Tracy case, there was no insurer which was supposed to pay plaintiff's claim against the minor if there were coverage and the quoted language must be considered in light of the facts in that case. The present case more nearly fits what was said about the guardian ad litem in Cox v. Wrinkle, 267 S.W.2d 648, 651 (Mo.1954): ". . . A guardian is to do for the infant what with riper judgment he would do for himself . . .", or in In re G———, 389 S.W.2d 63, 66 (Mo.App. 1955): ". . . He [the guardian ad litem] should not waive or give up anything which affects the interest of his ward . . ." Viewed in this light, the admission of liability made by the guardian ad litem was not a breach of duty, even though at first glance it appears contra to the admonition from Tracy v. Martin, supra. Gartenberg, acting as guardian, was confronted with a situation which may have been greatly detrimental to the interests of his ward—expected verdicts in excess of the policy limits—and believed it was in the best interests of his ward to enter into the statutory agreement. Gartenberg was under no obligation to protect the interests of Safeco.

While Safeco was thereby left in an exposed position, the agreement was specifically authorized by the statute and followed the language and purposes thereof. Eakins v. Burton, supra. There is no question but that an insurer which has elected for what it considers valid reasons not to defend a pending damage suit can be placed in a difficult position by those acting under the statute, but infirmities of

this sort in the statute, if so, can be corrected by the general assembly.

What disposition is to be made of these appeals? We have held that Roy Chapman was covered by both policies, as did the trial court. The U.S.F. & G. policy provides a maximum of $25,000 for any one person, including loss of services, and a maximum of $50,000 for any one occurrence. We cannot tell from the record what the limits of the Safeco policy are for any one person, but the limit appears to be $50,000 for any one occurrence. The Safeco policy also provides medical payments coverage, with a limit of $2,000 per person.

Robert Alonzo has recovered judgment against Roy Chapman for $87,500, the full amount sued for. His father has recovered judgment against Roy Chapman for $18,500 for loss of services, also the full amount sued for, but of course, these consequential damages must be considered as falling within the policy limits set for any one person.[6] Deborah Norman has a judgment against Roy Chapman for $45,000. These judgments are unsatisfied.

In addition, as earlier related, during the trial of the Robert Alonzo case against Jane Kloepper and Roy Chapman, a settlement was made by U.S.F. & G. whereby upon payment of $12,500 a motion for directed verdict was sustained in favor of Jane Kloepper. Later this $12,500 paid by U.S.F. & G. was allocated by the probate court $2,500 to Robert Alonzo and $10,000 to his father. The record does not disclose whether anyone else, either person or corporation, was also released as part of the $12,500 settlement.

The record does not show whether the jury in the Alonzo-Roy Chapman litigation was informed of the $12,500 payment and, if so, how they were instructed to treat it in assessing damages if they found for the plaintiffs, as they did. See the cases on this subject cited in the Committee Comment under M.A.I. 7.01, Missouri Approved Instructions (2d ed.) p. 61.

■ Both policies contain substantially identical other insurance clauses. The two clauses are in agreement that coverage as to a non-owned automobile is excess over any other valid and collectible insurance. This accords with the general rule which places primary liability on the insurer of the owner of the automobile involved rather than on the insurer of the operator, where we are dealing with the standard automobile liability policy. Powell v. Home Indemnity Company, supra; Fidelity & Casualty Co. of N. Y. v. Western Casualty & Surety Co., 337 S.W.2d 566 (Mo.App.1960); State Farm Mutual Auto. Ins. Co. v. Mid-Continent Casualty Co., 378 S.W.2d 232 (Mo.App.1964). It is clear from the clauses that the U.S.F. & G. policy, being the policy which covers the Dodge Dart as the owned automobile (that is, owned by the named insured, Dorothy Kloepper) has the primary coverage, while Safeco, which is the policy which covers the Dodge Dart as a non-owned automobile (that is, non-owned by James A. Chapman, who is the named insured in the Safeco policy, or by his son, Roy) has only excess insurance over the U.S.F. & G. insurance. See Fidelity & Casualty Co. of N. Y. v. Western Casualty & Surety Co., supra, and 76 A.L.R.2d 502, 505. The trial court, however, made no disposition of the respective liabilities of the two companies on the Alonzo and Norman judgments and the interest to be paid on the same, although

---

6. Both policies provide the limit of bodily injury liability stated in the declarations as applicable to "each person" is the limit of the insurer's liability for all damages, including damages for loss of services, arising out of bodily injury sustained by one person. See the annotation in 13 A.L.R.3d 1228, 1234–38. The theory is that " . . . the limitation was applicable to all claims of damage flowing from such bodily injury, and that therefore it is immaterial that some part of the damage may be claimed by a person other than the one suffering the bodily injuries. In other words, all damage claims, direct and consequential, resulting from injury to one person, are subject to the limitation." 13 A.L.R.3d l. c. 1234.

**822**

U.S.F. & G. prayed for such a declaration as part of its declaratory judgment action.

The Alonzos, while not counterclaiming against U.S.F. & G., did cross-claim against defendant Safeco and the trial court awarded the Alonzos $52,000 against Safeco on Count I. This judgment must be reversed as it does not take into consideration the Norman judgment and how the judgments totalling $151,000 ($106,000 + $45,000) are to be apportioned from the total coverage of $100,000 and $2,000 medical payments. As part of their cross claim against Safeco, the Alonzos included Count II, wherein they sought judgment against Safeco for the entire $106,000 in Alonzo judgments, on the ground Safeco was guilty of bad faith in refusing to settle and defend when it could have done so within the policy limits. The effect of the trial court's judgment on Count I is to find against the Alonzos and Count II on the claim of bad faith by Safeco in failing to settle, which action we affirm, as we do not believe the record supports such claim, Landis v. Century Indemnity Company, 390 S.W.2d 558 (Mo.App.1965), nor have the Alonzos appealed such ruling.

The Normans did not counter-claim against U.S.F. & G., nor cross-claim against Safeco, but, as stated, U.S.F. & G., prayed for a declaration of the rights of all the parties and Safeco sought a similar determination in its cross claim, and it being undisputed that Deborah Norman has a $45,000 judgment against Roy Chapman, the trial court must also declare her rights and the obligations of the insurers with respect thereto.

We therefore affirm the action of the trial court in finding coverage as to Roy Chapman under both policies and the action of the trial court in denying that count in the cross claim of the Alonzos which seeks to hold Safeco liable for the entire judgment on the charge of alleged bad faith in failing to settle and defend. We also affirm the action of the trial court in holding the Alonzo verdicts and judgments were not obtained fraudulently and collusively.

We reverse the action of the trial court in awarding the Alonzos $52,000 judgment against Safeco and remand for further proceedings as to all parties in accordance with this opinion.

MORGAN, BARDGETT, and FINCH, JJ., concur.

HOLMAN, J., concurs in result.

DONNELLY, C. J., dissents in separate dissenting opinion filed.

HENLEY, J., dissents and concurs in separate dissenting opinion of DONNELLY, J.

DONNELLY, Chief Justice (dissenting).

The policy issued by U.S.F. & G. to Dorothy Kloepper contained the following omnibus clause:

"The following are Insureds under Part I:

(a) with respect to the owned automobile,

(1) the Named Insured and any resident of the same household,

(2) any other person using such automobile with the permission of the Named Insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, and . . ."

The principal opinion gives this omnibus clause the following construction:

"4. Permission from the named insured can be found or implied from a course of conduct which evidences the willingness of the named insured to permit the first permittee to authorize others to drive, such as the broad and unrestricted use given by the named insured to her daughter in this case."

In effect, the Court has now ruled "that a named insured's grant of the unrestricted general use of the automobile to another includes authority to the latter to delegate its use to third persons, and that under

\* \* \* permission of that character a second permittee's use of the car \* \* \* is with the implied permission of the named insured within the meaning of the omnibus clause." 4 A.L.R.3d 10, 75.

I must respectfully disagree for at least the following reasons:

(1) I do not believe parents intend this result when they give a child such use of a family automobile.

(2) In my opinion, an insured "cannot be expected to intend to pay for coverage of persons who use his vehicle without his consent." American Motorists Insurance Company v. LaCourse, 314 A. 2d 813 (Me.1974).

(3) Until today, the word "permit" has been defined by this Court "as meaning 'to allow after notice or knowledge.'" Sanders v. City of Carthage, 330 Mo. 844, 852, 51 S.W.2d 529, 532 (1932).

I dissent.