**UNIVERSAL UNDERWRITERS INS. CO., Appellant,**

v.

**John Nicholas DAVIS, Michael Pierce, II, a Minor, and Mid-Century Insurance Company, Respondents.**

**No. WD 35421.**

Missouri Court of Appeals, Western District.

Feb. 13, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied April 2, 1985.

Application for Transfer Sustained May 29, 1985.

Case Retransferred Sept. 17, 1985.

Court of Appeals Opinion Readopted Oct. 22, 1985.

William H. Sanders, Sylvester James, Jr., Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for appellant.

James Ensz, Kansas City, for respondent John Davis.

Thomas R. Bellmann, Kansas City, for respondent Michael Pierce.

Lance W. LeFevre, Heilbron & Powell, Kansas City, for respondent Mid-Century Ins.

Before KENNEDY, P.J., and DIXON and CLARK, JJ.

CLARK, Judge.

This suit for declaratory judgment was brought to ascertain which of the contesting insurance companies was obligated to cover a liability claim resulting from an automobile accident. The trial court found appellant, Universal Underwriters, to be liable under a policy issued by it, and Universal appeals contending that the trial court misapplied the law. Reversed.

The facts of the accident, as pertinent here, and the circumstances under which the insured vehicle was being driven were not in dispute. One John N. Davis was operating a 1982 Oldsmobile on September 27, 1982 when a collision occurred between the car and two motorcycles. Michael Pierce, the operator of one of the motorcycles suffered fatal injuries in the accident.

Pierce's mother, Willena Calvin, commenced a wrongful death action against Davis.

The automobile Davis was driving was owned by H.E. Miller Oldsmobile, Inc., the insured under the policy issued by Universal. Davis, a resident of California, owned a passenger vehicle which he maintained there and which was insured by respondent, Mid-Century Insurance Company. The question for decision was whether coverage as to the September 27 collision was due Davis as an omnibus insured under the Universal policy or, failing that, under the non-owned substitute vehicle provisions of the Mid-Century policy. That respondent concedes effectiveness of its coverage if it be determined that the Universal policy is not applicable.

Davis' father was in the employ of Miller Oldsmobile as a salesman. He was provided the use of the 1982 Oldsmobile by Miller as a demonstrator vehicle. On the evening when the accident occurred, the son Davis was to attend a social function in the company of his brother, Christopher. The intent was that transportation for the two would be by Christopher's car which he had driven to Kansas City from Lawrence, Kansas. Some thirty minutes before the engagement, however, it was found that Christopher's car was inoperable and Davis prevailed on his father to loan him the demonstrator.

The issue in the case is whether the use of the 1982 Oldsmobile by son Davis for his personal transportation was with the permission of the vehicle owner and named insured of Universal, H.E. Miller Oldsmobile, Inc. That inquiry must be made because omnibus coverage under the Universal policy was limited by the contract language to "any other person using an owned auto * * * within the scope of your permission * * *." The term "your", as used in the foregoing phrase, is defined in the policy as referring to the named insured, in this case, H.E. Miller Oldsmobile, Inc. Salesman Davis was not a named insured and his permission given his son was not the permission required to activate

the omnibus coverage clause. The son John Davis was an insured by the definition of the Universal policy only if he was using the car within the scope of the permission, express or implied, given by H.E. Miller Oldsmobile, Inc.

Pertinent to the inquiry as to the subject of permitted use of the demonstrator automobile was the arrangement under which salesman Davis acquired the car from his employer. It was not disputed that this arrangement was covered by the written agreement introduced in evidence and entitled, "Employee Demonstrator Agreement." The document was signed by Davis and by the employer representative. The agreement called for Davis to drive the car as a "showroom on wheels," to maintain the interior and exterior in clean and presentable condition and to strive for high visibility to help advertise the product. He was admonished to drive the demonstrator to "church, club functions, shopping, etc." and to and from his residence and the dealership. A charge against the employee's earnings was made for the described personal use of $50.00 per month. The agreement also contained the following: "Members of the employee's family are prohibited from using the automobile for personal use."

At trial, Jack Davis testified that he was fully acquainted with the terms of his agreement with Miller Oldsmobile and the restriction in the agreement against any use of the demonstrator by members of his family for their personal convenience. He also testified that when he gave his son John permission to drive the 1982 Oldsmobile on September 27, 1982, he knew that was in violation of the permission given him by his employer and contrary to the terms of the agreement he had signed.

On these facts, the trial court found that John Davis' use of the demonstrator was within the uses anticipated by H.E. Miller Oldsmobile, Inc. and within the scope of its permission as contemplated in the Universal Underwriters policy. It also found that the agreement between Jack Davis and H.E. Miller Oldsmobile, Inc. prohibiting any members of the Davis family from driving a demonstrator was "wholly immaterial."

The seminal case establishing general guides for ascertainment of whether a second permitted driver is covered by omnibus clause insurance is *United States Fidelity and Guaranty Company v. Safeco Insurance Company*, 522 S.W.2d 809 (Mo. banc 1975). In that case, the first permittee, the seventeen year old daughter of the automobile's owner, had broad and unrestricted use of the car and had allowed a companion, also age seventeen, to drive when the accident occurred. The question was whether the conduct of the owner in giving free and unfettered control of the car to her daughter supported the inference that the daughter also was entitled to permit others to drive who would thereby do so under delegated permission of the owner. To decide such cases, the court announced particular rules. First, the proposition that permission must come from the named insured and not alone from the first permittee was reaffirmed. Second, the court held that permission by the named insured may be established by implication from circumstantial evidence which tends to show a willingness by the named insured for the first permittee to authorize others to drive. Finally, the court held that the circumstantial evidence relied on must show the permission as an inferred fact reasonably following upon the evidence and not a product of guess work, conjecture or speculation.

The *U.S.F. & G.* case was followed by *Farm Bureau Mutual Insurance Company v. Broadie*, 558 S.W.2d 751 (Mo.App. 1977). In that case, the vehicle owner and named insured was teaching his fifteen year old grandson to drive. On the night of the accident, the grandson and his companion Kim, who was seventeen and had a driver's license, borrowed the vehicle upon the express instruction of the grandfather that Kim and not his grandson should drive. Contrary to this direction, the grandson did later drive the vehicle and the accident occurred.

In *Broadie*, the omnibus insurance clause, unlike the language of the Univer-

sal policy here, stated that coverage extended to persons, responsible for the use of the automobile, "provided the *actual use* is with permission of the named insured." (Emphasis in original). The *Broadie* court concluded that use of an automobile involves its employment for some purpose or object and is distinguishable from the term "operation" which denotes control of the mechanism by the driver. Because the grandfather had given his permission to Kim and his grandson to take the vehicle and go "running around", the court concluded that the use being made at the time of the accident was a permitted use and the identity of the driver was immaterial notwithstanding the instruction as to who was to drive. For reasons not apparent in the content of the opinion, no reference is there made to the *U.S.F. & G.* case decided two years earlier.

Next in the sequence of second permittee cases is *Weathers v. Royal Indemnity Co.,* 577 S.W.2d 623 (Mo. banc 1979). There, Walker had rented a car from Hertz Corporation which held a Royal policy on its fleet of cars. That policy contained similar language to the clause in *Broadie,* that is, omnibus coverage was extended to any person using the car provided the *actual use* was with the permission of Hertz. When the accident occurred, Walker was riding in the car, but it was being driven by his companion, Davis. Royal resisted the claim that Davis was an omnibus insured relying on a provision in the Hertz rental agreement which prohibited *operation* of the car by anyone other than the rental customer, family members and employees of the customer.

The *Weathers* court first concluded that the then Section 303.190.2(2), RSMo.1969 obligated the insurer to provide omnibus coverage to all persons using the insured vehicle with express or implied consent of the owner and that public policy evidence in the statute required a liberal interpretation of the insurance contract in favor of coverage. Next, the court moved to consideration of the same question taken up in *Broadie,* the distinction between use and operation. The court approved the *Broadie*

analysis and noted that the Hertz contract with its customer did not restrict the use of the car, only its operation. In fact, the customer Walker had, in the words of the court, a broad, almost unfettered use. Significant in the *Weathers* opinion is its citation to and adoption of the statement in 7 Am.Jur.2d *Automobile Insurance,* § 117 (1963):

> "The 'general rule' that a permitee may not allow a third party to 'use' the named insured's car has generally been held not to preclude recovery under the omnibus clause where (1) *the original permittee is riding in the car with the second permittee at the time of the accident, or (2) the second permittee, in using the vehicle, is serving some purpose of the original permittee."* (Emphasis in original).

*Weathers* at page 629.

The court concluded that the purpose for which the Hertz car had been rented was being served when driven with Walker as a passenger and that there was no different *use* merely because Davis was driving.

Finally in the case of *Royal Indemnity Company v. Shull,* 665 S.W.2d 345 (Mo. banc 1984), the court reaffirmed *Weathers* in a somewhat altered fact situation. There, the car was again a rented Hertz vehicle contracted for by Simon. At the time of the accident, the car had been loaned by Simon to his cousin who in turn permitted her friend Feldman to drive. Simon did not accompany his cousin and Feldman on the journey in progress when the accident happened. The only operative difference between *Weathers* and *Shull* was the fact that the lessee, Simon, was not present in the vehicle. The court concluded that where the automobile leasing company tenders complete dominion over the car to the lessee, an insured use includes loaning the car to a second permittee if the use serves some purpose of the original permittee. As the court described that purpose, "The trip by Shull and Feldman to St. Louis was a 'use' of the rented car by Simon, in the sense that it was

something he wanted to bring about, as is shown by his lending of assistance in making the vehicle available to them." *Shull* at p. 347.

The majority opinions in *Weathers* and *Shull* make no mention at all of *U.S.F. & G. v. Safeco*. The dissent in *Weathers* does cite the case but notes it as involving a factual situation not comparable to the Hertz car rental case. There is no indication that *Weathers* or *Shull* purport to overrule *U.S.F. & G. v. Safeco*. Instead, they affirm, at least tacitly, the basic premise that where the first permittee is given general dominion over the vehicle, permitted uses having the implied approval of the owner include operation of the vehicle by a second permittee if that use serves some purpose encompassed within the objective under which the first permittee acquired the car.

Before turning to the present case, some facts which distinguish this case from *Weathers* and *Shull* should be noted. First, the omnibus insuring agreements are different. The Universal policy in this case covered persons other than the named insured only while using the vehicle within the scope of the permission given by the named insured. The policies in *Weathers* and *Shull* did not refer to scope of permission, only actual use. Second, the purpose for which salesman Davis in the subject case was given the demonstrator was set out by written agreement to be a sales and display tool to be used in furtherance of the mutual business of Miller and Davis. In both *Weathers* and *Shull*, the lessee of the rented vehicle was given "a broad, almost unfettered use"; "complete dominion over the car." Finally, there was no showing in either *Weathers* or *Shull* that the lessee had any express notice or actual knowledge of the lease contract provision prohibiting *operation* of the leased car by third persons. Here, salesman Davis had

full knowledge of the limitation against family use of the demonstrator for personal convenience, a restriction which employed the broader term "use." [1]

Under the guidelines of *U.S.F. & G. v. Safeco*, and under *Weathers* and *Shull* as well, applied to the subject case, the son John Davis has coverage under the Universal Underwriters policy only if his use of the Oldsmobile demonstrator was with the express or implied permission of the named insured, Miller Oldsmobile. On this point, there is no evidence in the record to support the finding by the trial court that the use being made of the vehicle was a use which Miller Oldsmobile even inferentially sanctioned, use being defined as the purpose or object for which salesman Davis was furnished the car. The demonstrator agreement showed that Miller Oldsmobile was unwilling to have the car used for personal purposes by Davis family members and that salesman Davis agreed. The policy of restricted demonstrator use was shown to be a longstanding one consistently enforced by Miller Oldsmobile and regularly explained to and understood by company employees. Salesman Davis testified that he was aware of the limitation and knew at the time he loaned the car to his son that he was violating the Employee Demonstrator Agreement.

Seeking the benefit of *Weathers* and *Shull*, respondent Mid-Century argues that personal use of the car by salesman Davis was permitted and therefore the attempted exclusion of son Davis concerns a distinction in the identity of the operator, not in the use. If the use was within the permitted ambit, respondent contends that question of who was driving the car is irrelevant.

As was noted earlier in this opinion, the demonstrator agreement instructed the salesman to drive the car to church, club

---

**1.** In his opinion in *Shull* Judge Blackmar suggests that a use restriction against second permittees would be enforced if effectively agreed to by notice to the first permittee. "The lessor could ask for and obtain explicit information as to who would drive the car. If others besides the customer were listed, it is highly probable that express permission might be given, or at least, that no objection would be voiced. Any actual objection could be voiced." *Shull* at p. 348.

functions, shopping, etc. The purpose to be accomplished, however, and the corresponding "use" for ascertainment of the scope of permission, was not to serve the personal convenience and needs of salesman Davis or his family but "to help advertise the employer's product" and to attain "high visibility of the automobile." The car was the salesman's sample to use in attracting sales prospects and for sales demonstrations. Quite obviously, that purpose was to be served only when Davis as the salesman was present to answer inquiries and procure sales leads. Under the facts of this case, the purpose or object for which the automobile was to be used under the Employee Demonstrator Agreement was necessarily interrelated with its operation by salesman Davis, hence the agreement prohibition against personal use by Davis family members.

The rule is well settled that whether or not implied permission for use of a vehicle has been shown must be determined primarily as a factual matter in each case. *Wells v. Hartford Accident and Indemnity Company*, 459 S.W.2d 253, 258 (Mo. banc 1970). The proposition controls as well in cases of second permittees where the permission in issue by the named insured is demonstrated by inference. *State Farm Mutual Automobile Insurance Co. v. Foley*, 624 S.W.2d 853 (Mo.App.1981). Under the rules set out in *U.S.F. & G. v. Safeco*, there was no evidence in this case implying a willingness by Miller Oldsmobile for salesman Davis to let members of his family use the demonstrator for personal errands. Any contrary result flies directly in the face of the explicit agreement of the parties to the contrary. The conclusion reached by the trial court does not reasonably follow upon the evidence and it is therefore erroneous.

This case is distinguishable factually from *Weathers* and *Shull* because the lessee in those cases, even considering the lease agreement restriction on *operators*, had complete dominion over the car, the relevant insuring clauses were different and the lease contract limitation on operators was unnoticed by the leasee. On this

account, the disposition ordered here does not conflict with *Weathers, Shull* or with *Broadie*, but follows the thread consistent in all the cases that the fact of whether the use in any case is or is not within the permission of the insured must be a reasonable inference from the evidence.

The judgment is reversed.

DIXON, J., concurs.

KENNEDY, P.J., dissents in separate opinion.

KENNEDY, Presiding Judge, dissenting.

I respectfully dissent.

The majority opinion seems to me to be in conflict with *Farm Bureau Mutual Insurance Company v. Broadie*, 558 S.W.2d 751 (Mo.App.1977); *Weathers v. Royal Indemnity Company*, 577 S.W.2d 623 (Mo. banc 1979); and *Royal Indemnity Company v. Shull*, 665 S.W.2d 345 (Mo. banc 1984). Those cases establish the proposition, in a variety of factual situations, that where the named insured permits the *use* to which the insured automobile is being put at the time of the accident, then the fact that the *driver* does not have the named insured's permission to drive, or even that he is *forbidden to drive*, does not defeat coverage under the omnibus clause which provides coverage when the "actual use of the auto" is "within the scope of (the named insured's) permission."

The "actual use" in this case was expressly permitted, i.e., the transportation of salesman Davis's sons, who were guests at his house, to a reception honoring their former teacher. The written bailment contract under which salesman Davis had possession of the car, included as Appendix A hereto, not only permitted such use, it required that the car be driven "to church, club functions, shopping, etc." This served a business purpose of the owner, in that it gave the automobile "high visibility" as the owner's "showroom on wheels", according to the language of the contract. Furthermore, Mr. H. E. Miller, president of the owner, expressly testified that this was a

permitted use. For this personal use salesman Davis was charged $50 per month and the contract also required that he pay the first $250 of any damage to the car if it should be damaged while it was in personal use.

The majority opinion, on the other hand, seeks to say that the "use" being made of the car at the time of the accident was not a permitted use, because the *use and the driver* in this case are inseparably linked; that the purpose of the bailment was that the car be used as a "sales tool", and that this involved salesman Davis's being in it or near it to answer questions. The trouble with the theory is that the evidence in no way bears it out. The bailment contract itself says:

> The automobile is our showroom on wheels and the employee should strive for high visibility of the automobile to help advertise the employer's product. (The demonstrator should be driven to church, club functions, shopping, etc.). Public response to the automobile will be tempered by its appearance. For this reason the automobile will be maintained in proper condition for presentation to the public. Interior and exterior must be clean and well-groomed at all times.

Mr. Miller testified that the automobile had on it a price sticker, which contained price information, options, EPA rating and also contained the name of the dealer. Also the name of H. E. Miller Oldsmobile was on a nameplate on the back of the car. While the car's use as a "sales tool" might in rare instances be enhanced by having a salesman at the wheel (there was no evidence of this at all), it certainly cannot be said that the purpose of the bailment was lost or substantially diminished by its being driven by someone other than salesman Davis. Mr. Miller's testimony was as follows:

> Q. If the vehicle is driven to a public function with all the markings, the sticker, your tag on the back, the dealer plates, clearly marking it as a dealer vehicle, and the purpose of issuing that car to the salesman is for the purpose of public exposure, the exposure of the public to that car, then it really doesn't make any difference for that purpose that the car is driven by—is actually driven there by the salesman or not, does it; the same purpose is still served, exposure of the car to the public, regardless of who drove it?
>
> A. I don't see the reason for your question. The automobile carries dealer plates, it carries—supposed to carry the sticker on the window, which is supposed to be on it, carries my name plate on the back, so when you say that, you about answered all questions ... It's for the public's eyes.
>
> Q. .... If it is in fact driven to a public event, that same purpose is served, is it not, regardless of who actually drove it there, isn't that true? The public is—still has exposure to the vehicle?
>
> A. Yes, the public would have exposure to the vehicle.

I do not know how we can say *as a matter of law*, contrary to the fact-finding of the trial court, that the use in this case was not a permitted use. Whether the use is permitted is primarily a factual matter, upon which we should defer to the trial court, not substitute our own judgment. *Wells v. Hartford Accident and Indemnity Co.*, 459 S.W.2d 253, 258 (Mo. banc 1970).

I will add one more thing on a point suggested by Judge Blackmar's opinion in *Shull*, and accorded some significance therein. It is there pointed out that the lessee of the automobile, who contrary to the bailment contract allowed someone else to drive, had not been warned by the lessor that there would be no insurance coverage for such an unpermitted driver. In the present case, that also is true. There is no evidence that salesman Davis had any notice at all that lending the car to someone else to drive would nullify insurance coverage. (Salesman Davis did testify that his son had his own insurance, and when he reported the accident to his employer he explained in mitigation of his offense that

his son had his own insurance. Whether this indicates that he believed there was no coverage under the policy in question is unknown. And if he did have such a belief, there is no reason to think it came from the named insured.) In fact, the bailment contract itself says only that: "Use of the automobile beyond the terms of this agreement may result in assessment of additional withholding and social security taxes by the Internal Revenue Service. In that event, the employee assumes full responsibility for his additional taxes." Salesman Davis could very well have supposed that that (and his possible discharge from employment) would be the only consequence of his allowing someone else to drive the car.

The appellants and the majority opinion rely upon *United States Fidelity & Guaranty Company v. Safeco Insurance Company of America*, 522 S.W.2d 809 (Mo. banc 1975). That case was decided upon a first permittee-second permittee analysis. The court did not notice the use-operation dichotomy at all; apparently the parties did not raise it. The latter analysis first came into focus in *Broadie* and has been further developed in *Weathers* and *Shull*. *USF & G v. Safeco* is not authority for the position of the majority opinion.

Even under that case, though, and under the first permittee-second permittee analysis, I believe the trial judge's finding of coverage ought to be sustained on the basis of implied permission running from H. E. Miller Oldsmobile to the driver John Nicholas Davis. The bailment contract prohibition against a "member of the employee's family" driving the car does not apply to John Nicholas Davis. While the term "family" may have a narrower or a broader meaning, in this context it would be coextensive with the term "household". *Cobb v. State Security Insurance Co.*, 576 S.W.2d 726, 738 (Mo. banc 1979). He was an emancipated married adult living in California. *See Cobb v. State Security Insurance Co.*, 576 S.W.2d at 738; *Giokaris v. Kincaid*, 331 S.W.2d 633, 640–41 (Mo.1960). The implication is that all but members of the family would be permitted to drive the car. John Nicholas Davis had bought two cars from his father and had never bought a car from anyone else. He was not an immediate sales prospect but he might become one. I can by no means join my fellow judges in saying that as a *matter of law* he did not have implied permission of the owner to drive the automobile under the *USF & G v. Safeco* standards. I would not overturn the trial judge's decision on this point, even if the first permittee-second permittee analysis were proper in this case. There is good reason to affirm, under that analysis. But I do not rest my dissent on that ground. I put my dissent on the ground that the use to which the car was being put was a permitted use, following the *Broadie, Weathers* and *Shull* decisions. The majority opinion tends in the opposite direction from those cases in *restricting* rather than *expanding* coverage within the allowable meaning of the policy language. See *Weathers*, 577 S.W.2d at 625.

Judgment of the trial court should be affirmed.

## APPENDIX A

EMPLOYEE – DEMONSTRATOR – AGREEMENT

Agreement for employee use of automobile owned by __H. E. Miller Oldsmobile, Inc.__

This agreement between _____Jack R. J. Davis_____ (employee) and

__H. E. Miller Oldsmobile, Inc.__ (employer), provides for the employee's use of automobiles owned by the employer.

1. The employee is required to drive a make of automobile sold by the employer, however, the employee will be assigned a model of automobile, in the color, and with equipment as determined by the employer. The automobile is for sale at all times and the employee must change automobiles at the employer's convenience.

2. The automobile is our showroom on wheels and the employee should strive for high visibility of the automobile to help advertise the employer's product. (The demonstrator should be driven to church, club functions, shopping, etc.) Public response to the automobile will be tempered by its appearance. For this reason, the automobile will be maintained in proper condition for presentation to the public. Interior and exterior must be clean and well groomed at all times.

3. The employee must submit an evaluation of the automobile, when requested, with emphasis on selling features.

4. The employee will store the automobile at their home during evenings and off hours and be responsible for reasonable security precautions.

5. The automobile must be available during business hours and at reasonable off hours for other employee use in making sales demonstrations, available for picking up supplies when small enough to carry in car and picking up customer's car for repairs and leaving automobile with customer until repair has been made to customer's car.

6. The employee is expected to drive the vehicle between the dealership and his residence for security of the vehicle, and to and from activities for high visibility of our product, all other personal use is prohibited unless approved in advance by the employer. For this personal use as listed above the employer will adjust the income by $50.00 per month and make a commensurate charge of $50.00 per month for personal use.

7. Use of the automobile beyond the terms of this Agreement may result in assessment of additional withholding and social security taxes by the Internal Revenue Service. In that event, the employee assumes full responsibility for his additional taxes.

8. Collision insurance with $250 deductible and no glass breakage will be furnished. The employee is responsible for the first $100 damage and all glass breakage. If the automobile is damaged and not in the course of business, the employee will be responsible for damage up to $250.00. Members of the employee's family are prohibited from using the automobile for personal use.

The undersigned has read and understands this Agreement. Signature below indicates acceptance with full knowledge that willful violation may result in discharge from the employment of H. E. Miller Oldsmobile, Inc.

Signed: _____
(employee driving demonstrator)

Date: 1/19/81 _____

_____
(dealer representative)