NATIONAL INDEMNITY COMPANY, a corporation, Plaintiff-Respondent,

v.

LIBERTY MUTUAL INSURANCE COMPANY, a corporation, Defendant-Respondent,

Commercial Union Insurance Company of New York et al., Defendants-Appellants.

No. 57643.

Supreme Court of Missouri, Division No. 2.

July 22, 1974.

Motion for Rehearing or to Transfer to Court En Banc Denied Sept. 9, 1974.

Gray, Friedman & Ritter, Charles E. Gray, St. Louis, for plaintiff-respondent.

Hocker, Goodwin, Koenig, Gibbons & Fehlig, John M. Goodwin, Edward K. Fehlig, St. Louis, for respondent Liberty Mutual Insurance Company.

Evans & Dixon, Eugene K. Buckley, St. Louis, for appellants Commercial Union Ins. Co. of New York and R. H. Mooney and Associates, Inc.

Cox & Moffitt, William A. Moffitt, Jr., John B. Busch, St. Louis, for said defendants-appellants.

FINCH, Judge.

This is a declaratory judgment action seeking a determination as to which, if any, of several insurance policies provide coverage for Elmer C. Rinderknecht and R. H. Mooney and Associates, Inc. in connection with a suit seeking damages of $90,000 filed by defendants Wilbert J. and Alvera R. Thomassen. The amount in controversy is $90,000, the amount sued for by the Thomassens. Travelers Indemnity Co. v. Bohn, 460 S.W.2d 642 (Mo.1970). We have jurisdiction based on the amount involved since this appeal was taken prior to January 1, 1972. Sec. 477.040 [1]; Mo. Const., Art. V, §§ 3, 31(4), V.A.M.S.

The Thomassens' suit rose out of a collision on July 12, 1968 between the Thomassen vehicle and a 1964 Chevrolet operated by Rinderknecht, a salaried insurance claims adjustor of Mooney, while he was on business for that company. The trial court held that none of the three insurance companies provide liability coverage for Rinderknecht applicable to the Thomassens' suit and that only Commercial Union Insurance Company of New York (Commercial Union) has coverage for Mooney. We affirm that holding except that we conclude that National Indemnity also covers Mooney. For that reason we reverse and remand for entry of a new judgment.

Critical to resolution of the matter of coverage is the determination of whether

1. All statutory references are to RSMo 1969 unless otherwise indicated.

Rinderknecht was owner of the 1964 Chevrolet which he was operating at the time of the accident. The trial court held that he was the owner but that determination is attacked on appeal. We first consider that issue.

The Chevrolet came into Rinderknecht's possession on May 13, 1968 when he and his minor son Lawrence went to Valley Ford Sales, Inc. (Valley Ford) to purchase an automobile. The car was for use of Lawrence but since he was a minor, Rinderknecht accompanied him for the expressed purpose of executing all necessary documents. In addition, whereas Rinderknecht previously had worked for an employer where he used a company car, Mooney required that he furnish his own transportation. He had been using Larry's Ford automobile in his new job and since the Ford was being traded in on the new purchase, it was Rinderknecht's intention to use it in his new employment with Mooney until such time as he acquired an automobile for his own use.

It was Rinderknecht's plan to finance the balance of the purchase price after receiving credit for the Ford which was traded in on the purchase. Accordingly, he signed a retail installment sales contract and security agreement, which provided for a purchase price, including time price differential, of $2,048 which was to be paid in 30 monthly installments of $68.-28 each.

Rinderknecht testified that on May 13, 1968 he signed several papers including the installment sales contract but that he did not remember signing an original application for title. He also testified that he did not receive or see the assigned title certificate to the 1964 Chevrolet. However, there was evidence indicating that the title certificate was assigned and that Rinderknecht signed various copies of an application for title because the transcript discloses that on May 16, Florissant Loan & Finance Company (Florissant Loan), which purchased the Rinderknecht con-

tract from Valley Ford, received from Valley Ford a signed copy of the installment sales contract, the duly signed and notarized title certificate and two executed duplicate copies of an application for title signed by Rinderknecht. On that same day Florissant Loan paid the balance of the sales price to Valley Ford. It then forwarded the endorsed certificate of title, the security agreement and the lienholder's copy of application for title to the department of revenue in order to perfect its lien on the Chevrolet. Subsequently, on June 11, 1968 Florissant Loan received notice of perfection of its lien.

Around July 28, 1968 Rinderknecht received a letter from the department of revenue informing him that the original of his application for title to the 1964 Chevrolet had not been received and that until it was received, no new certificate in his name could be issued. A photostatic of the copy of the application on file in the motor vehicle office was shown on that communication. Rinderknecht testified that he and his son then made various calls to Valley Ford seeking the original application for title, but that it was not received from Valley Ford until September when he went by and picked it up. He then forwarded it and the sales tax to the department of revenue and thereafter a new title certificate to the Chevrolet was received from the department.

On the basis of the foregoing evidence, the trial court made findings of fact in which it recited that it found that Rinderknecht purchased the 1964 Chevrolet from Valley Ford pursuant to an installment sales contract; that financing of that contract was arranged by Valley Ford through Florissant Loan on the date of sale with the knowledge and consent of Rinderknecht; that Rinderknecht at the time of the purchase signed an installment contract and an application for title; that at said time Valley Ford endorsed and notarized the title certificate to the 1964 Chevrolet with the name of Elmer C. Rinderknecht shown as assignee; and that Valley Ford

then delivered to Florissant Loan the assigned title certificate, a copy of the installment sales contract and two duplicate signed copies of the application for title to be used by the lienholder to secure its lien. The court found that within a few days after receiving the papers from Valley Ford, Florissant Loan paid the balance of the purchase price to Valley Ford and then forwarded the endorsed certificate of title, the security agreement and the lienholder's copy for application for title to the motor vehicle department and had its lien perfected. The court held that Valley Ford had complied substantially with § 301.210 [2] by endorsing the certificate of title to Rinderknecht, notarizing the same and, with the knowledge and consent of Rinderknecht, delivering it for financing purposes to Florissant Loan. The court concluded that the subsequent failure of Rinderknecht to file an application for title and to pay the requisite sales tax in order to obtain a new certificate of title did not affect the transfer of ownership from Valley Ford to Rinderknecht and, hence, that on or after May 13, 1968 the 1964 Chevrolet was owned by Rinderknecht.

Section 301.210, the statute which governs the sale and transfer of motor vehicles, has been strictly construed and enforced by the courts of Missouri. This court has held that unless the previously issued certificate of title is properly assigned and acknowledged by the seller and delivered to the buyer, the attempted sale of a used car passes no title even though accompanied by full payment and delivery of physical possession of the automobile to the purchaser. State Farm Mutual Automobile Insurance Co. v. MFA Mutual Insurance Co., 485 S.W.2d 397 (Mo.banc 1972).

■ In this case there is no real question but that on May 13, 1968 Valley Ford, the dealer, signed and acknowledged at the appropriate place an assignment of the Chevrolet title certificate to Rinderknecht. Rather, appellants say that there was no delivery of that certificate to Rinderknecht and hence there was no passage of title. The evidence shows that instead of physically delivering the assigned certificate to Rinderknecht Valley Ford delivered it (along with a copy of the installment sales contract and copies of an application for title signed by Rinderknecht) to Florissant Loan, the company which was financing the purchase. The question presented is whether such delivery constitutes a sufficient compliance with the requirements of § 301.210.

We conclude that the trial court was correct in holding that what occurred constituted a sufficient delivery to comply with the provisions of § 301.210 and that as a result Rinderknecht did become owner of the 1964 Chevrolet. We do so because § 301.620 [3] provides that if the owner (in

2. Section 301.210 provides in part as follows:
"1. In the event of a sale or transfer of ownership of a motor vehicle or trailer for which a certificate of ownership has been issued the holder of such certificate shall endorse on the same an assignment thereof, . . . and deliver the same to the buyer at the time of the delivery to him of said motor vehicle or trailer.
\* \* \* \* \*
"4. It shall be unlawful for any person to buy or sell in this state any motor vehicle or trailer registered under the laws of this state, unless at the time of the delivery thereof, there shall pass between the parties such certificate of ownership with an assignment thereof, as herein provided, and the sale of any motor vehicle or trailer registered under the laws of this state, with-

out the assignment of such certificate of ownership, shall be fraudulent and void."

3. Section 301.620 deals with duties of the parties upon creation of a lien or encumbrance and provides in part as follows:
"If an owner creates a lien or encumbrance on a motor vehicle or trailer:
"(1) The owner shall immediately execute the application, in the space provided therefor on the certificate of ownership or on a separate form the director of revenue prescribes, to name the lienholder on the certificate, showing the name and address of the lienholder and the date of his security agreement, and cause the certificate, application and the required fee to be delivered to the lienholder;
"(2) The lienholder shall immediately cause the certificate, application and the re-

this case the purchaser) creates a lien on his automobile, he immediately shall cause the certificate of title (as well as an application to show the lien thereon) to be delivered to the lienholder which then shall forward same to the director of revenue. In this case, if the assigned title certificate had been handed physically to Rinderknecht by Valley Ford, it would have been Rinderknecht's obligation forthwith to deliver same to Florissant Loan. What occurred, as summarized in the paragraphs following, shows that the objectives of §§ 301.210 and 301.620 were accomplished.

The evidence shows that Valley Ford assigned the title certificate to Rinderknecht, acknowledged that assignment and then mailed the assigned title certificate along with other necessary papers to Florissant Loan so as to enable it to perfect the lien on the automobile as against Rinderknecht as owner. It is clear from the evidence that Rinderknecht and his son went to Valley Ford with a specific intent to purchase a motor vehicle for the son and to borrow money to accomplish that result. Since Rinderknecht had not arranged for his own financing prior to the visit to Valley Ford, it is reasonable to conclude that Valley Ford was to do so and that Rinderknecht acquiesced in that arrangement. As a matter of fact, Florissant Loan was shown as lienholder on the application for title signed that day by Rinderknecht.

Rinderknecht testified that he went along to "execute loan papers and so forth." According to his testimony, he signed several papers which included the retail installment sales contract. It is obvious that he also signed a Missouri application for title because two executed copies of that application were later delivered to Florissant Loan, one of which was forwarded by it to the Missouri Department of Revenue. In addition, when Rin-

derknecht obtained the original of the application for title from Valley Ford in September, it was already executed by him and was sent in to the motor vehicle department to obtain the new title certificate.

Rinderknecht took possession and control of the Chevrolet on May 13, 1968; he kept it under his dominion and control thereafter; he made the scheduled payments to Florissant Loan under the retail installment sales contract; he eventually sent in the application for Missouri title and paid the sales tax; he at no time repudiated the contract, either before or after the accident; and he never offered to return the automobile to Valley Ford.

This court, in requiring strict compliance with § 301.210, has pointed out that this is for the purpose of protecting not only the party to a particular sale but the public generally. Such requirement enables the state to keep an up-to-date registry of all automobiles registered in the state and their ownership, thereby making traffic in stolen cars as difficult as possible. State v. Glenn, 423 S.W.2d 770 (Mo.1968). What occurred here as shown by the evidence accomplishes those purposes. The title certificate to the used automobile was properly assigned to Rinderknecht. Although Rinderknecht could not legally sell the Chevrolet until he filed the original application for title and received a new certificate, neither could anybody else. Thus, Rinderknecht was protected. The title certificate was delivered to the State of Missouri promptly along with the copy of application for title and the installment sales contract. The state thus was advised of the transfer, including the date of the sale, by whom the sale was made, and the name of the purchaser. The state's interest with respect to stolen cars war protected. Finally, the interest of the lienholder was protected.

quired fee to be mailed or delivered to the director of revenue;

\* \* \* \* \*

"(4) Upon receipt of the certificate of ownership, application and the required fee,

513 S.W.2d—30

the director of revenue shall either endorse on the certificate or issue a new certificate containing the name and address of the new lienholder, and mail the certificate to the first lienholder named in it."

The fact that Rinderknecht did not physically touch or perhaps even see the assigned title certificate on May 13, 1968 does not invalidate the transaction under the facts here shown. We hold that the delivery by Valley Ford to Florissant Loan, determined by the trial court to have been with the knowledge and consent of Rinderknecht, was a constructive delivery by Valley Ford to Rinderknecht. See Galemore v. Mid-West National Fire & Casualty Insurance Co., 443 S.W.2d 194 (Mo.App.1969).

Our conclusion that title passed under those circumstances is supported by the decision in Insurance Co. of North America v. Alexander, 321 F.Supp. 697 (E.D. Mo.1970), aff. 441 F.2d 1170 (8th Cir. 1971). In that case the motor company had on hand a used Jaguar to which it had received an assigned Florida title certificate from a previous dealer. One Alexander agreed to purchase the Jaguar, and he executed a purchaser's statement, a retail installment sales contract, a check for $1,000, a promissory note to the dealer for the balance, and a Missouri application for title. The dealer properly executed and notarized the assignment of the Florida certificate of title to Alexander as well as signing the retail installment sales contract plus the necessary blank on Alexander's applicaion for Missouri title. The parties agreed that the Tower Grove Bank & Trust Co. would provide the financing of the unpaid balance. The dealer exhibited the endorsed title certificate to Alexander and told him it would deliver that certificate to the bank. Subsequently, all of these papers were forwarded by the bank to the Missouri Department of Revenue and thereafter a title certificate showing the lien in favor of Tower Grove Bank & Trust Co. was issued.

Thereafter, Alexander had an automobile collision and the other party made demand on the liability insurance carrier of the dealer on the theory that the sale of the Jaguar was void since Alexander did not receive physical possession of the assigned title certificate and that, as a result, he was covered under the dealer's insurance policy as a permissive user.

The U. S. District Court considered the applicable Missouri statutes and concluded that title had passed to Alexander on the basis that what occurred constituted a constructive delivery of the title certificate to Alexander.

While the evidence in the foregoing case disclosed affirmatively that the title certificate was shown to Alexander and he was told that it would be mailed to the bank, we do not consider that this evidence made any substantial difference in the result reached in that case and the one which should be arrived at in the case now on appeal. There still was no actual physical handing of the certificate to the purchaser. Instead there was a constructive delivery to him by virtue of a transmission thereof by the seller directly to the lienholder. Such constructive delivery was held to be a compliance with § 301.210.

We have considered various cases cited by appellants which they contend show that Valley Ford, not Rinderknecht, owned the 1964 Chevrolet at the time of the accident.[4] We will not lengthen this opinion by analyzing those cases. Suffice it to say that none of them are comparable or govern this case. In each of them, either the title certificate was not executed and notarized as required by § 301.210 or there was neither actual nor constructive delivery of the assigned title certificate.

Having determined this preliminary question of ownership, we proceed to a consideration of the various policies of insurance.

4. These cases include: Sabella v. American Indem. Co., 372 S.W.2d 36 (Mo.banc 1963); Allstate Ins. Co. v. Hartford Acc. & Indem. Co., 311 S.W.2d 41 (Mo.App.1958); Haynes v. Linder, 323 S.W.2d 505 (Mo.App.1959); Greer v. Zurich Ins. Co., 441 S.W.2d 15 (Mo. 1969).

## NATIONAL INDEMNITY COMPANY POLICY

National Indemnity issued its combination automobile policy to Rinderknecht as named insured for a term of one year from April 4, 1968. The policy did not designate a particular automobile to be insured under the policy but instead noted on the schedule that a non-owner policy endorsement was attached.[5] Endorsement No. 5 attached to the policy was a printed non-owner policy endorsement which provided in part as follows:

"It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability, for Property Damage Liability and for Automobile Medical Payments applies with respect to the use of any automobile by or on behalf of the named insured or his spouse if a resident of the same household, subject to the following provisions:

"1. With respect to the insurance for Bodily Injury Liability and for Property Damage Liability the unqualified word 'insured' includes (a) such named insured and spouse, and

(b) any other person or organization legally responsible for the use by such named insured or spouse of an automobile not owned or hired by such other person or organization. Division (a) of Insuring Agreement III, Definition of Insured, does not apply to this insurance.

"2. The insurance does not apply:
(a) as respects the named insured, to any automobile owned by the named insured and as respects the spouse of the named insured, to any automobile owned by the named insured, such spouse or a member of the same household other than a private chauffeur or domestic servant of such named insured or spouse, provided this subdivision (a) does not apply with respect to bodily injury, sickness, disease or death of the named insured or spouse through being struck by an automobile under division 2 of Coverage C;"

\* \* \* \* \* \*

"4. This insurance shall be excess insurance over any other valid and collectible insurance for Bodily Injury Liability, for Property Damage Liability and for Automobile Medical Payments."

Having determined that the 1964 Chevrolet involved in the accident was owned by Rinderknecht, it follows that under paragraph 2(a) of the foregoing endorsement there was no coverage provided for Rinderknecht in connection with the Thomassen collision. Paragraph 2(a), which excludes coverage in certain instances with reference to owned automobiles, specifically provides that the limitation therein contained applies "as respect the named insured".[6] In other words, Rinderknecht bought insurance to protect him (and his spouse) only with reference to the operation of non-owned vehicles. The policy provided no coverage applicable to the operation by Rinderknecht or his spouse of owned vehicles.[7]

5. This policy was obtained by Rinderknecht at a time when he was driving the Ford automobile which later was traded in on the purchase of the 1964 Chevrolet. The Ford was largely for the use of Rinderknecht's son Larry but the title thereto was registered in the name of Rinderknecht's former wife. Consequently, at that time Rinderknecht had no automobile registered in his name and he purchased a policy of insurance which covered the operation of non-owned vehicles in order to provide coverage applicable to his operation at that time. Rinderknecht did not have the policy in question endorsed to cover the subsequently acquired 1964 Chevrolet or to delete the non-owner endorsement until August 30, 1968 at which time the policy was so endorsed.

6. Subsequent language also makes it applicable to the spouse of the named insured.

7. Paragraph 3 of the foregoing non-owner policy endorsement does provide a grace period of 30 days in which there would be

The trial court held that Rinderknecht is not covered by National Indemnity with respect to the Thomassen accident and we agree with that conclusion.

The trial court also held that the National Indemnity policy provides no coverage for Mooney with respect to this accident, basing its conclusion on the proposition that the "policy covered only a 'non-owned' automobile operated by Rinderknecht." That decision obviously was premised on the proposition that paragraph 2(a) of the non-owner endorsement operated to limit coverage with respect to all persons and organizations that qualified as insureds, not just the named insured and his spouse.

■ With the foregoing conclusion we disagree. Paragraph 2(a) specifically limits its application to the named insured or his spouse. It says, "This insurance does not apply: (a) as respects the named insured . . . and as respects the spouse of the named insured . . . ." That language makes no reference to and does not purport to limit the insurance provided in paragraph 1(b) of the non-owner endorsement wherein insurance is provided to "any other person or organization legally responsible for the use by such named insured or spouse of an automobile not owned or hired by such person or organization."

The non-owner coverage provided these additional insureds is limited in its application only if the automobile operated by the named insured or spouse is owned or hired by the person or organization claiming coverage under paragraph 1(b). The record on appeal shows, as we have held, that the Chevrolet was owned by Rinderknecht, not by Mooney. Furthermore, the record is devoid of any evidence that said automobile was hired by Mooney. The

trial judge in paragraph 9 of his findings of fact made the finding that Rinderknecht received $100 per month automobile expense allowance but there is no evidence in the record to support that finding.[8] Since the car driven by Rinderknecht was neither owned nor hired by Mooney, we conclude and hold that Mooney was an insured under the provisions of paragraph 1(b) of the non-owner endorsement to the National Indemnity policy.

## LIBERTY MUTUAL INSURANCE COMPANY POLICY

■ Liberty Mutual issued its garage liability policy to Valley Ford as named insured for a period commencing July 1, 1968. It provided bodily injury liability coverage for the named insured and for certain others including any person while using with permission of the named insured an automobile to which the insurance was applicable under the automobile hazard provisions of the policy. Coverage under the latter provision was claimed by Rinderknecht and Mooney on the basis that title had not been transferred from Valley Ford to Rinderknecht at the time of the accident and that Rinderknecht was driving the automobile as a permissive user of Valley Ford. However, we have held that title did pass on May 13, 1968 and that the car belonged to Rinderknecht not Valley Ford. Possession was delivered on that date to Rinderknecht. As a result, there was no coverage for either Rinderknecht or Mooney due to a specific exclusion in the policy which provides as follows:

"None of the following is an insured:

\*　　\*　　\*　　\*　　\*　　\*

"(iii) any person or organization, other than the named insured, with respect to any automobile

coverage if the named insured acquires ownership of an automobile, but that paragraph is inapplicable here. Its effective period is for the 30 days following date of the acquisition of the ownership of the car. The 1964 Chevrolet was acquired May 13, 1968 and the accident occurred July 12, 1968,

which was after expiration of the grace period.

8. The briefs make reference to a deposition in which there was testimony with reference to such an allowance, but the deposition was not offered in evidence and cannot be considered.

\* \* \* \* \* \*

(b) possession of which has been transferred to another by the named insured pursuant to an agreement of sale;

\* \* \* \* \* \*

The trial court held that neither Rinderknecht nor Mooney was an insured under the Liberty Mutual policy. We affirm that holding.

## COMMERCIAL UNION INSURANCE COMPANY OF NEW YORK POLICY

Commercial Union issued its policy to R. H. Mooney and Associates, Inc. for a term of one year commencing May 1, 1968. It included both comprehensive general liability and comprehensive automobile liability endorsements. We are concerned only with the latter.

Both Mooney and Rinderknecht claimed to be insureds entitled to coverage under this policy. Commercial Union concedes that Mooney, the named insured, is covered and the trial court so found. That determination is not in issue on this appeal.

With reference to Rinderknecht, the trial court found that he was not insured under the Commercial Union insurance policy and was not entitled to coverage thereunder. Rinderknecht, the Thomassens, and certain other appellants attack that determination on this appeal.

The pertinent policy provisions which specify the persons insured by the policy provide as follows:

"Each of the following is an insured under this insurance to the extent set forth below:

"(a) the named insured;

"(b) any partner or executive officer thereof, but with respect to a non-owned automobile only while such automobile is being used in the business of the named insured;

"(c) any other person while using an owned automobile or a hired automobile with the permission of the named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, but with respect to bodily injury or property damage arising out of the loading or unloading thereof, such other person shall be an insured only if he is:

(1) a lessee or borrower of the automobile, or

(2) an employee of the named insured or of such lessee or borrower;

"(d) any other person or organization but only with respect to his or its liability because of acts or omissions of an insured under (a), (b) or (c) above."

There is no contention that Rinderknecht is entitled to coverage under (a), (b) or (d) above. The assertion of a right to coverage is based on the provisions of subparagraph (c) which provides coverage for any other person provided he is using an owned automobile or a hired automobile with permission of the named insured.

The definition section of the automobile liability endorsement defines those terms as follows:

" 'hired automobile' means an automobile not owned by the named insured which is used under contract in behalf of, or loaned to, the named insured, provided such automobile is not owned by or registered in the name of (a) a partner or executive officer of the named insured or (b) an employee or agent of the named insured who is granted an operating allowance of any sort for the use of such automobile;

\* \* \* \* \* \*

" 'owned automobile' means an automobile owned by the named insured;"

■ There is no contention that Mooney owned the 1964 Chevrolet driven by Rinderknecht. However, some of the appellants contend that it was a hired automobile and that Rinderknecht is covered for that reason.

The trial court found that Commercial Union did not cover Rinderknecht. It did so on the basis that he received a $100 per month allowance from Mooney for use of his automobile and that this excluded him as an insured under the express language of (b) of the definition of hired automobiles. As we have pointed out, there is no evidence in the record on appeal to show that Rinderknecht did receive such an allowance and we cannot exclude him on that basis.

However, the fact remains that there is no evidence to show that the automobile he was driving was a hired automobile. There is no evidence in the record of any contract or agreement or hiring arrangement whereby Mooney rented or hired the Chevrolet. Hence, Rinderknecht does not qualify as an insured under subparagraph (c) of the section of the policy specifying persons insured. On this basis we affirm the holding of the trial court that the Commercial Union policy does not provide coverage for Rinderknecht.

■ Finally, having determined that both the National Indemnity and the Commercial Union policies provide coverage for Mooney, we note that both policies contain provisions undertaking to make such coverage excess over any other insurance available to the insured. Under the case of Arditi v. Massachusetts Bonding & Insurance Co., 315 S.W.2d 736 (Mo.1958) we hold said provisions to be mutually repugnant and, consequently, hold that the two insurers provide primary coverage, liability under their coverages to be prorated in proportion to the amount of insurance provided by their respective policies.

The judgment is reversed and the cause remanded with directions to enter judgment in accordance with the views herein expressed.

All of the Judges concur.

PER CURIAM.

In its motion for rehearing or in the alternate for transfer of this case to the Court En Banc, National Indemnity Company concedes that there was no evidence in the transcript that Mooney paid a car allowance of $100 per month to Rinderknecht. However, it points out that there was testimony to that effect in a deposition (of which the court's opinion took cognizance) and asserts that in furtherance of justice the case should be remanded for retrial to permit the introduction of such evidence.

■ We recognize that on occasion this court has followed such course when there was indication of the existence of essential evidence which might produce a contrary result. This, however, is not that kind of a situation. Even with evidence before us that Mooney paid Rinderknecht a monthly car allowance of $100 per month, we would reach the same result. When an employer agrees to and does pay an employee a salary plus a specified sum per mile as reimbursement of expenses for use of the employee's automobile, that does not constitute a hiring or renting of the employee's car, absent express contractual provisions to the contrary. It constitutes only a reimbursement of expenses. Johnson v. Continental Casualty Co., 167 So. 114 (La.App.1936). The fact that instead of "keeping books" on mileage, the employer and employee agree on a flat monthly car expense reimbursement does not change the nature of the arrangement.

The National Indemnity policy contains no contractual provision which provides to the contrary. It has no definition of "hired automobile". We note that the Commercial Union policy did have a definition of "hired automobile" which provides that "an automobile not owned by the named insured which is used under

 

contract in behalf of, or loaned to, the named insured providing such automobile is not owned by or registered in the name of \* \* \* (b) an employee or agent of the named insured who is granted an operating allowance of any sort for the use of such automobile." Rinderknecht would fall within exclusion (b) thereof. Hence, if we use that definition (which is understood to be a fairly commonly used definition),[1] the result would be exactly as specified in our opinion.

We have considered the other matters asserted in National Indemnity's motion but conclude that they present no reason for granting a rehearing or for transferring this case to the Court En Banc. Accordingly, the motion is overruled.

[1]. 7 Appleman, Insurance Law and Practice, § 4454, p. 492.