**ALLSTATE INSURANCE COMPANY, Plaintiff-Appellant-Respondent,**

**v.**

**NORTHWESTERN NATIONAL INSURANCE COMPANY OF MILWAUKEE, WIS., a corporation, Defendant-Respondent,**

**Farmers Insurance Company, Inc., a corporation, Defendant-Respondent-Appellant,**

**Sheryl Lynn Wilson, Debra Jean Wilson Carr (Now Bandy), Janice Ann Baker, Helen P. Baker, Glen L. Baker and Harold Wilson, Defendants-Respondents-Appellants,**

**and**

**Gregory Palmer Hayes, Defendant.**

**Nos. 10599, 10596 and 10581.**

Missouri Court of Appeals,
Southern District,
Division One.

April 30, 1979.

Motions for Rehearings or Transfers
Denied May 22, 1979.

Applications to Transfer Denied
June 19, 1979.

Donald E. Bonacker, Jerry L. Reynolds, Bonacker & Reynolds, Springfield, for plaintiff-appellant-respondent.

Malcolm L. Robertson, Ronald E. Mitchell, Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin, for defendant-respondent.

Wallace N. Springer, Jr., Springfield, for defendant-respondent-appellant.

A. L. Shortridge, Joplin, for defendants-respondents-appellants.

TITUS, Judge.

On January 1, 1972, 17-year-old Gregory Hayes (Gregory), then residing in Joplin with his parents, was driving a 1965 Buick with parental consent when it collided with a car occupied by three sisters. The Buick was allegedly owned by Brown Enterprises, Inc. (Brown), the named insured in an automobile liability policy issued by Northwestern National Insurance Company of Milwaukee, Wisconsin (Northwestern).[1] Gregory's father, James Hayes, was the named insured in a policy issued by Allstate Insurance Company (Allstate) which listed a 1971 Buick as the insured vehicle. Farmers Insurance Company (Farmers) provided uninsured motorists coverage on the vehicle occupied by the injured sisters. As plaintiff, Allstate filed this declaratory judgment action to determine which liability insurer, if any, provided coverage for Gregory. After the Circuit Court of Jasper County found that Allstate alone had liability coverage, all parties, save Northwestern and Gregory, appealed.

The pertinent parts of Allstate's and Northwestern's policies are:

ALLSTATE (James Hayes named Insured)

"*The following persons are insured under this Part* 1. The named insured with respect to the owned or a non-owned automobile; . . . 4. Any relative with respect to a non-owned private passenger automobile . . . not regularly furnished for use of such relative; . . . . *Definitions of words used under this Part* 1. Persons Insured . . . (b) 'named insured' means the individual named . . . and his spouse if a resident of the same household; and (c) 'relative' means a relative of the named insured who is a resident of the same household. 2. Automobiles Covered . . . (e) 'non-owned automobile' means an automobile . . . not owned by the insured or any relative . . . ."

___

1. Subsidiaries of Brown were also named insureds in Northwestern's policy. However, for purposes here, all will be collectively referred to as "Brown."

NORTHWESTERN (Brown named Insured)

"II. PERSONS INSURED . . . (a) the named insured . . . (b) any partner or executive officer thereof, but with respect to a non-owned automobile only while such automobile is being used in the business of the named insured; (c) any other person while using an owned automobile . . . with the permission of the named insured, provided his actual operation . . . thereof is within the scope of such permission . . . .. VI. ADDITIONAL DEFINITIONS . . . 'non-owned automobile' means an automobile which is neither an owned automobile nor a hired automobile; 'owned automobile' means an automobile owned by the named insured . . . .."

The only record of title to the 1965 Buick possessed by the Missouri Department of Revenue showed that it had been sold new to a Centralia, Missouri, couple by Don Stein Buick, a new car dealer in Kansas City, Kansas. Nevertheless, the evidence disclosed the following occurred in 1969. The Centralia couple traded in the 1965 Buick for a new car and endorsed the Missouri title thereto "over to Don Stein." Stein sold the 1965 Buick to a Joplin used car dealer who, on the same day, sold the automobile to a used car dealer in Diamond, Missouri, who, in turn, sold the vehicle to Brown. This latter sale by the Diamond dealer was probably made off the Joplin dealer's lot. The Joplin dealer testified that when he sold cars to other dealers, the reassignment form on the title would be left blank or "open." As the Diamond dealer's records did not contain the serial number of the 1965 Buick, he opined he had not been given the title certificate to the vehicle and had not completed an assignment thereon to Brown. Among other things, Brown was in the used car business. Albeit Brown was to furnish its insurer, Northwestern, with a schedule of owned vehicles, no schedule furnished the insurer included the 1965 Buick. It was also shown that Brown, in respect to used automobiles it had for sale, would not "title" them in its name but "kept open titles" on such cars as the other used car dealers had done. Brown was declared bankrupt shortly after the accident in question. The trustee in bankruptcy never found any evidence that Brown had owned, had title to or possession of the 1965 Buick. To further confound the matter, the 1965 Buick bore a blank Missouri intrastate sticker which, among others, had been sold on February 2, 1971, by the Missouri Department of Revenue to a Joplin auto auction company and a set of 1971 Missouri automobile license plates issued for a 1963 Ford registered in the names of one Tripoli and his niece. What connection the auto auction company had with the 1965 Buick or how Brown came into possession of the license plates, went unexplained. It is also unknown who, other than Brown, purportedly had possession of or claimed title to the vehicle between 1969 and late 1971.

Three to eight weeks (no one was sure) before the January 1, 1972, accident, Brown's president, while visiting with James Hayes (Gregory's father), learned that Hayes' wife was mostly afoot because her uninsured Dodge station wagon was inoperable. The president offered James Hayes the unfettered and free use of the 1965 Buick and did not restrict the operation of the vehicle to any particular member of the Hayes family. At that time the president was aware that Mr. and Mrs. Hayes had children but he did not know how many, if any, were of driving age.

*Allstate's Policy*

With respect to a non-owned automobile under Allstate's policy, it should be noted that the contract afforded coverage to the "named insured" (defined as "the individual named [James Hayes] and his spouse") without qualification, whereas the coverage given a "relative" was restricted to " 'a private passenger automobile . . . not regularly furnished for use of such relative.' " In neither situation was the permission of the owner of the 1965 Buick required. *Sperling v. Great American Indemnity Company,* 7 N.Y.2d 442, 199 N.Y.S.2d 465, 468, 166 N.E.2d 482, 484 (1960); 7 Am.

Jur.2d, Automobile Insurance, § 107, p. 418. Therefore, the evidence and arguments of counsel anent scope of use of the 1965 Buick granted James Hayes by Brown's president is of no moment here. Nevertheless, the exclusion of coverage for a relative driving a non-owned automobile is, by its terms, "concerned with *regularity* of use, not *permissiveness* of use." *Sperling,* supra, 199 N.Y.S.2d at 469, 166 N.E.2d at 485.

· Our overall view of the evidence regarding the 1965 Buick is that it, for all intents and purposes upon being delivered into the keeping of James Hayes, became and was regularly used as a second family car by all family members. James Hayes primarily used the 1971 Buick in his daily business trade and travels which consumed the majority of time it was driven and employed. When given to such use, Mrs. Hayes and Gregory were relegated to operating the older car. But when both vehicles were infrequently available to all, the American affection of vehicular vanity prompted preference for driving the newer Buick. At the Hayes residence was a two-car garage, one-half of which was constantly occupied by the inoperable Dodge station wagon. Consequently, whichever Buick was parked in the usable part of the garage ordinarily dictated the driving of the other more accessible vehicle which would be parked in the open unblocked portion of the driveway. Of course, as in normal family situations, 17-year-old Gregory's use of either automobile was subject to preemption through parental prerogative and leave granted by his father or mother.

As to Gregory's use of the 1965 Buick, the evidence was that he used the car "on whatever occasion arose" but "never consistent." He drove it to perform errands, on "dates" and two or three times as transportation to and from school. Errand trips could occur one to five times daily, although there were days when no such trips were required. The "dating" was about twice a week and the 1965 Buick would be driven if the 1971 Buick was parentally preempted. Gregory "couldn't recall ever being refused permission to drive the '65 whenever [he] asked," although his father indefinitely opined

there may have been times when his son was "grounded" from using either car for disciplinary reasons. On the occasion of the accident, Gregory was driving the 1965 Buick "with no restrictions" while his parents were employing the newer vehicle in making their rounds of New Year's Eve festivities.

As indicated previously, the trial court concluded Gregory was included as relative-insured under Allstate's policy because, so it figured, the 1965 Buick was not regularly furnished for his use. We disagree.

While Allstate's policy extended limited coverage to relatives when driving non-owned automobiles, the primary purpose of the contract was to afford insurance coverage to those operating the vehicle designated in the policy, i. e., the 1971 Buick. The patent purpose of the non-owned automobile coverage as it related to a "relative", was to blanket only occasional or incidental driving of such private passenger automobiles without the payment of additional premiums but to exclude coverage on non-owned regularly furnished vehicles which would materially increase the risk undertaken by the insurer sans a corresponding augmentation in the premium. Annot: Automobile Policy—Driving Other Car, 86 A.L.R.2d 937, 940.

In deciding whether a non-owned automobile has been "regularly furnished for use," our Supreme Court has said "that we should not limit ourselves either to a test of merely determining motive or purpose or one of simply measuring length and extent of availability of use. Rather, each case should be decided on its own facts, and the court should take into consideration the type and length of use, the purpose for which the non-owned automobile was furnished, and any other pertinent facts, including a determination of whether the use and purpose was in harmony with or violative of the objective of the 'non-owned automobile' clause." *State Farm Mut. Auto. Ins. Co. v. Western Cas. & Sur. Co.,* 477 S.W.2d 421, 424[2] (Mo. banc 1972).

Applying here the criteria to be considered as dictated by *State Farm,* supra, the record illustrates that Gregory drove the 1965 Buick "on whatever occasion arose" and for virtually every kind of use designed for a private passenger automobile entrusted to a teen-age driver supervised by parental control. In fact, it was while he was using it for personal pleasure on New Year's Eve "with no restrictions" that the accident in question occurred. Gregory's variable uses of the automobile, which generally occurred when the other car was also being operated, were spread over a period of several weeks and evidenced that Gregory's employment of the 1965 Buick was not for limited purposes but for any type of use which he and his parents selected. Under the circumstances in this case it would be most difficult for us to conclude that the extension of coverage under Allstate's policy to the 1965 Buick would comport with the objective of the non-owned automobile clause in the contract of insurance. Mr. Hayes, principally, had the 1971 Buick available for driving during all the time that Gregory concurrently used the older car which is violative of the basic idea that Allstate's policy was to insure one car for one premium and to exclude the regular or habitual use of other automobiles.

Other pertinent facts to be considered are that the 1965 Buick was regularly garaged on the Hayes' premises and readily and regularly available to Gregory for driving with parental consent. Retention of the car keys by Gregory's mother and his need to ask for them in conjunction with obtaining permission to drive the car, does not distract from a finding of Gregory's regular and frequent use of the 1965 Buick. *Farmers Ins. Co., Inc. v. Morris,* 541 S.W.2d 66, 68–69 (Mo.App.1976); *Boedigheimer v. Taylor,* 287 Minn. 323, 178 N.W.2d 610 (1970).

Our statement of facts, supra, does not substantially differ from the findings enounced by the trial court, and we agree that the meaning of Allstate's policy, when considered with the question of whether such facts bring the matter within the extended coverage afforded, constitutes a question of law. However, we are not bound by and, as previously noted, do not defer to the court's conclusion as to the legal effect of its findings of fact. *State ex rel. Sisco v. Buford,* 559 S.W.2d 747, 748 (Mo. banc 1978); *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). In short, we are of the opinion that the court nisi erred in holding that Gregory, as a matter of law, was an insured under Allstate's policy. Furthermore, with respect to Northwestern's assertion that Allstate's policy should afford Gregory coverage because its conduct amounted to waiver or estoppel, it suffices to observe once again that estoppel or waiver "may bar a defense to a right the insured once had, [but] such will not create a new coverage or rights not found in the contract." *Macalco, Inc. v. Gulf Ins. Co.,* 550 S.W.2d 883, 891[7] (Mo. App.1977) and cases there cited.

### Northwestern's Policy

Except in cases involving new motor vehicles, § 301.200, V.A.M.S., requires that a car dealer have in his possession "a separate certificate of ownership, either of such dealer's immediate vendor, or of the dealer himself" in the form prescribed by the director of revenue. Reported cases illustrate the form specified by the director requires that when the dealer is a buyer, he must take an assignment of title directly to himself and may make a reassignment directly to his vendee without getting a new title certificate in his own name as is required in the case of sales between non-dealers. Also, as the statute attests, the director is authorized to require an acknowledgment as part of the assignment form, thereby making an unacknowledged assignment insufficient to vest legal title. *Pearl v. Interstate Securities Co.,* 357 Mo. 160, 164–165, 206 S.W.2d 975, 978[9, 10] (banc 1947).

Opinions iterate that the provisions of § 301.210, V.A.M.S.,[2] govern the sale or

2. Sec. 301.210: "1. In the event of a sale or transfer of ownership of a motor vehicle . . . for which a certificate of ownership has been issued the holder of such certificate shall indorse on the same an assignment thereof, with warranty of title in form printed thereon, and

transfer of used automobiles [*Inland Discount Corp. v. St. Louis Auto Auction Barn,* 303 S.W.2d 185, 187[1] (Mo.App.1957); *Mallory Motor Company v. Overall,* 279 S.W.2d 532, 535[6] (Mo.App.1955)] and consistently rule that absolute technical compliance with the statute is required, otherwise the purported sale or transfer is fraudulent and void. *Case v. Universal Underwriters Ins. Co.,* 534 S.W.2d 635, 639 (Mo.App.1976). If there is a failure to strictly comply with the law, no title passes and the intended buyer acquires no ownership even though he be guilty of no intentional wrongdoing and acted in complete good faith. *Horton v. State Farm Fire & Cas. Co.,* 550 S.W.2d 806, 809[2, 3] (Mo.App.1977).

The term "owner" is defined in § 301.010(21), V.A.M.S., as "any person, firm, corporation or association, who *holds* the legal title of a vehicle . . . ." (Emphasis supplied). Thus, in the case of a used motor vehicle, the fact of ownership is created by the delivery of a properly assigned certificate of title. Registration is one step beyond proper assignment of title and an individual may become the owner of a motor vehicle although he has not yet become registered as the owner. E. g., An owner may sell a car to a dealer who becomes its legal owner (provided the title is properly assigned to the dealer) even though, as far as registration is concerned, the vehicle is still registered in the name of the seller. §§ 301.200–1 and 301.210, V.A.M.S. Nonetheless, by the express terms of § 301.210, supra, no title passes to the purchaser of a used automobile in Missouri, be the purchaser an individual or a dealer, if the seller's certificate of title is not properly endorsed and acknowledged and given to the intended purchaser at the time of the vehicle's delivery or as soon thereafter so as to be considered a part of a contemporaneous or continuous transaction. *Kahn v.*

*Lockhart,* 392 S.W.2d 30, 34[3] (Mo.App. 1965).

Applying the foregoing to the matter at hand, the facts attest that the only known certificate of ownership relating to the 1965 Buick was issued by the Missouri director of revenue to a Centralia couple after they purchased it new. The couple, so said the husband, endorsed the title over to a Kansas dealer in 1969 when a new model was bought. Whether the title was properly endorsed and acknowledged by the couple remains unknown. But even assuming so, it was reasonable for the court nisi, as trier of the facts, to conclude, as it did, that subsequent used car dealers (including Brown) who had the vehicle either did not possess a certificate of title thereto, or, if so, did not have one which had been properly assigned and acknowledged so as to vest any one of them with legal title in accordance with the mandates of § 301.210, supra. "[U]nless the previously issued certificate of title is properly assigned and acknowledged by the seller and delivered to the buyer, the attempted sale of a used car passes no title even though accompanied by full payment and delivery of physical possession of the automobile to the purchaser. *State Farm Mutual Automobile Insurance Co. v. MFA Mutual Insurance Co.,* 485 S.W.2d 397 (Mo. banc 1972)." *National Indemnity Company v. Liberty Mutual Ins. Co.,* 513 S.W.2d 461, 464 (Mo.1974). Our inevitable conclusion is that Brown never had legal title to and never did own the 1965 Buick. It follows, therefore, that Gregory, at the time of the concerned accident was driving an automobile not owned by Brown and not insured by Northwestern.

### Farmers' Policy

As an appellant, Farmers asseverates the trial court erred in rendering its supplemental decree which declared that

---

prescribed by the director of revenue, . . . and deliver the same to the buyer at the time of the delivery to him of said motor vehicle . . . . . . . 4. It shall be unlawful for any person to buy or sell in this state any motor vehicle . . . registered under the laws of this state, unless at the time of the delivery thereof, there

shall pass between the parties such certificate of ownership with an assignment thereof, as herein provided, and the sale of any motor vehicle . . . registered under the laws of this state, without the assignment of such certificate of ownership, shall be fraudulent and void."

Farmers' policy afforded uninsured motorists coverage to the injured sisters "because said decree was coram non judice in that the judgment was beyond the scope of, and unsupported by, the pleadings in the cause." We shall see anon that this point relied on has an anomalous history.

Per Rule 81.14(b), V.A.M.R., the transcript commences with Allstate's first amended petition and the responding pleadings of the other parties. However, from subsequent transcript entries, it appears the defendant children had originally filed crossclaims against Gregory and Farmers. At the children's request, the court dismissed the crossclaims without prejudice. Assuming the crossclaims asserted claims against Farmers under its uninsured motorists coverage, the claims were effectively withdrawn. Nevertheless in subparagraph (c) of Farmers' responsive pleading to Allstate's amended petition, it asked the court to declare that Gregory "is not an uninsured motorist under the terms of [Farmers'] coverage," thereby keeping that issue a viable one in the case.

Following the original trial, as heretofore indicated, the circuit court entered judgment declaring Allstate liable and exonerating Northwestern. However, as that purported judgment made no mention of Farmers and did not undertake to adjudicate its affirmative assertions concerning uninsured motorists coverage, this court was required to dismiss the original appeals because the judgment failed to dispose of Farmers. *Allstate Ins. Co. v. Northwestern Nat. Ins. Co. of Milwaukee, Wisc.,* 539 S.W.2d 118 (Mo.App.1976).

When the cause reverted to the attention of the trial court, curious things occurred. No efforts were immediately forthcoming to enter a final appealable judgment. Rather, Farmers dismissed subparagraph (c) of its prayer which affirmatively sought a declaration that Gregory was not an uninsured motorist with respect to its policy and moved for leave to amend its answer to effect deletion of subparagraph (c). Although the motion was sustained, the court nisi proceeded to hear testimony and re-

ceive discovery documents and exhibits anent the uninsured motorists issue. These latter proceedings happened over Farmers' objections that there then remained no issue before the court relative to the construction of the uninsured motorists provisions of Farmers' policy. Furthermore, after Farmers, by leave previously granted, did file its separate answer which made no mention of a declaration of its policy's uninsured motorists coverage, the court supplemented its first decree by adjudging that Farmers provided such coverage.

Though we do not undertake to deal with the propriety vel non of all the proceedings permitted in the trial court following dismissal of the first appeal, it is not amiss to observe that no party, save Farmers and perhaps the injured sisters, petitioned the trial court to make a declaration regarding Farmers' uninsured motorists coverage. If the sisters had, in fact, ever done so, their claims were effectively dismissed as live issues before the initial trial, and Farmers' prayer for any such declaration was, by dismissal and filing of an amended answer by leave of court, deleted from its pleadings and prayers before the court undertook a determination of the issue despite Farmers' objections. Points adjudicated and determined must be within the issues pleaded and submitted. If the court undertakes to determine questions that are outside such issues, because effectively withdrawn before submission or not pleaded, any attempted judgment relative thereto is void. *Kemp v. Woods,* 363 Mo. 427, 434, 251 S.W.2d 684, 687–688[3 and 5] (1952); *Rains v. Moulder,* 338 Mo. 275, 282, 90 S.W.2d 81, 84[2 and 3] (1936); *Simpson v. American Automobile Insurance Company,* 327 S.W.2d 519, 531–532[11, 12] (Mo.App.1959); *Clark v. Clark,* 300 S.W.2d 851, 852[2] (Mo. App.1957).

For the reasons stated, that part of the judgment in favor of Northwestern is affirmed and those portions of the judgment against Allstate and Farmers are reversed and the cause is remanded with directions to the trial court to enter judgment compatible with the views and holdings expressed in this opinion.

HOGAN, J., and CAMPBELL, MOORE and KENNEDY, Special Judges, concur.

FLANIGAN, P. J., recused.

GREENE, J., not participating because not a member of the court when cause was submitted.