MFA MUTUAL INSURANCE COMPA-
NY, Plaintiff-Respondent,

Western Insurance Company,
Plaintiff-Appellant,

Jimmie Dale Clayton, Hirschbach Motor
Lines and Beulah Sartin, Administratrix
of the Estate of Stephen Lee Sell, Plain-
tiffs,

v.

HOME MUTUAL INSURANCE COMPA-
NY, Larry Dixon Palmer, Dixon Palmer,
and Larry McCoy, Defendants-Respon-
dents.

No. WD 32058.

Missouri Court of Appeals,
Western District.

Oct. 20, 1981.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
Nov. 24, 1981.

Application to Transfer Denied
Jan. 18, 1982.

Ross Eshelman, Clinton, for appellant.

William J. Cason, Michael X. Edgett, Fred R. Bunch, Clinton, for respondent MFA.

W. James Foland, William L. Yocum, Kansas City, for respondent Home Mut.

Edward J. Murphy, Butler, for respondents Palmer, et al.

Before TURNAGE, P. J., and PRITCHARD and CLARK, JJ.

CLARK, Judge.

This is an action in declaratory judgment for adjudication of coverage under five automobile liability insurance contracts. The parties are the insurance carriers, the policyholders and the damage claimants. After dismissal of a prior appeal for want of a final judgment,[1] the trial court again took up the cause on stipulated facts and entered judgment. This appeal by one of the insurers, Western, contends in the first and dispository point that the trial court misapplied the law to exonerate another party-insurer, Home Mutual, from responsibility under a policy it had issued. We conclude that the contention is correct and reverse the judgment.

The relevant facts of the case were stipulated and are thus undisputed. The number of parties, insured vehicles and insurance contracts, however, present a challenge, both to summary description and preliminary definition of the issues. In the following recitation of facts, the format of matching insurance carrier with policyholder is observed in aid of clarification.

### The Home Mutual Policy

Stephen Lee Sell, now deceased, owned two vehicles, a 1970 Chevrolet and a 1965 Chevrolet, and he had possession of but did not hold title to a 1970 Dodge. At all relevant times, Home Mutual had in force an automobile liability insurance policy which named Sell as the insured and which listed as the vehicles covered by the policy the two Chevrolet cars. Although Sell had possession of the Dodge for nearly one year, he did not report the car to Home Mutual or make any application for extension of coverage to include that vehicle.

### The Western Policies

Larry McCoy, a claimant for personal injuries sustained in the accident which killed Sell, owned three vehicles,[2] a 1977 Ford pickup, a 1976 Ford sedan and a 1964 Ford grain truck. At all relevant times, Western had in force an automobile liability insurance policy which named McCoy as the insured and which listed the three Ford vehicles as covered by the policy. The 1977 Ford pickup was being driven by McCoy at the time of the accident with Sell.

Larry Palmer, an additional claimant for personal injuries, was riding with McCoy as a passenger in the Ford pickup at the time of the accident. Larry, the son of Dixon and Angell Palmer, owned a 1951 Ford and a 1976 Jeep. Those vehicles, together with two vehicles owned by Dixon and Angell, were covered by automobile liability insurance policies issued by Western. Those policies, in force at all relevant times, named Dixon and Angell Palmer as insureds. None of the Palmer cars was involved in the accident with Sell.

### The MFA Policy

Dixon Palmer, who asserts no affirmative claim here on his own behalf, owned yet another vehicle which was titled in his name alone. At all relevant times, MFA had in force an automobile liability insurance policy covering this vehicle and naming Dixon Palmer as insured. Larry Palmer made his home with his parents and was thus a resident of their household as the

---

1. *MFA Mutual Insurance Co., et al. v. Home Mutual Insurance Co., et al.*, 600 S.W.2d 521 (Mo.App.1980).

2. McCoy, who operated a service station, actually owned or held an interest in eight vehicles, but only three were insured under the Western policy. The parties make no claim relevant to the other five.

term is applicable to automobile insurance contracts.

## The Accident

On August 15, 1977, Sell was driving the 1970 Dodge when he collided with a tractor-trailer unit and then with the vehicle occupied by McCoy and Palmer. The accident resulted in Sell's death, injuries to McCoy and Palmer and damage to McCoy's pickup truck and to the tractor-trailer for which Jimmie Dale Clayton and Hirschbach Motor Lines have a property damage claim of $4848.

Sell had acquired possession of the 1970 Dodge from one Nadine Junkin on August 25, 1976, almost one year before the accident. He paid her the purchase price of $400.00 but never acquired title transfer or title registration. The record title to the Dodge was in Larry B. Junkin, Nadine's former husband. At the time of the transaction with Sell, Nadine endorsed her former husband's name and gave Sell the title certificate, but without notarial acknowledgement. When delivered to Sell, the Dodge had no license plates.

On the date Sell acquired the Dodge from Nadine Junkin, he drove it to his home in Clinton and parked the vehicle. Transfer of title registration was not processed and the vehicle was never licensed. From the date the car was first driven to Sell's home on August 25, 1976, until the date of the accident, August 15, 1977, neither Sell nor anyone else drove the car. During this same time period, Sell had available to him the other two cars insured under the Home Mutual policy. The reason Sell had decided to drive the Dodge the day he was killed was never discovered.

## The Insurance Coverage Issues

The Home Mutual policy issued to Sell for limits of $25,000/$50,000 bodily injury and $10,000 property damage liability included the provision that liability coverage was provided the named insured for the listed vehicles and also for a non-owned automobile operated by the named insured with the owner's permission, provided the non-owned vehicle was not furnished or available for the regular use of the named

insured. The Western policies issued to McCoy and the Palmers included standard uninsured motorist coverages. The MFA policy issued to Dixon Palmer also provided uninsured motorist coverage, but contained a clause not found in the Western policy. That clause limited omnibus coverage, including uninsured motorist benefits, to relatives of the named insured living in the same household provided such relative did not own an automobile.

The dispute in the case centers on whether or not Sell was protected under the Home Mutual policy for operation of the Dodge, a car which he did not own. If coverage applies, then Home Mutual is obligated to defend Sell's administratrix against the claims of McCoy, Palmer, Clayton and Hirschbach Motor Lines and pay such claims to the limits of the policy. If, however, Sell was not covered by the Home Mutual policy when he drove the Dodge on the day of his fatal accident, then Sell was an uninsured motorist and Western and MFA have potential exposure under their policies to McCoy and the Palmers. In the latter event, the parties are in disagreement as to whether Palmer as a passenger is entitled to stack the three coverages under McCoy's policy, whether Palmer may additionally stack the four coverages under Western's policies to the Palmers and whether he may also stack the MFA coverage under the policy of Dixon Palmer.

■ For the reasons hereafter given, we conclude that the 1970 Dodge was a non-owned private passenger automobile not available for the regular use of Sell and that Home Mutual must afford coverage for claims arising out of the August 15, 1977 accident. This conclusion renders the other stacking and coverage issues moot.

■ In its judgment which recorded findings of fact and conclusions of law, the trial court ruled that the Home Mutual policy provided no coverage for Sell and that he was an uninsured motorist, thus invoking the provisions of Western's policies. While deference is normally accorded to the judgment in a court-tried case, that rule stems

from the superior opportunity of the trial court to gauge the credibility and value of oral testimony. In this case, however, the facts are derived from pleadings, stipulations, exhibits and depositions. The usual rule of deference is therefore inapplicable. *Case v. Universal Underwriters Insurance Co.*, 534 S.W.2d 635 (Mo.App.1976). Moreover, this case turns upon the application of plain contract language to facts not in dispute. No deference is due the trial court's judgment where resolution of the controversy is a question of law. *See v. St. Paul Insurance Co.*, 577 S.W.2d 150 (Mo.App. 1979). We therefore examine the primary issue, the policy obligation of Home Mutual, without reference to the determination made below.

As noted above, coverage of the liabilities incurred by Sell while operating the Dodge car attach under the Home Mutual policy upon two conditions: (1) the vehicle is not owned by the insured but it is being driven with permission, and (2) the vehicle is not furnished to or is available for the regular use of the insured. As to the first condition, the parties stipulated for the purposes of this action that Sell did not own the Dodge. Indeed, the agreed facts require this conclusion because a failure to comply strictly with the statute governing transfer of title to an automobile results in the purported buyer acquiring no ownership even though the parties act in good faith. *Allstate Insurance Co. v. Northwestern National Insurance Co. of Milwaukee*, 581 S.W.2d 596 (Mo.App.1979). The agreed facts also pose no question as to Sell's authority to drive the car, a permission implicit in the incomplete purchase transaction.[3]

Determination of the coverage extension under the Home Mutual policy to include Sell's operation of the Dodge on August 15, 1977 turns then on the second factor, whether the Dodge was available for Sell's regular use from the date he acquired it on August 25, 1976.

While the parties have cited no case of comparable facts and independent research has disclosed none, the case regularly cited as establishing the criteria where the question is in issue is *State Farm Automobile Insurance Co. v. Western Casualty and Surety Co.*, 477 S.W.2d 421 (Mo. banc 1972). In describing the purpose to be served by the "non-owned automobile" clause in liability insurance policies, the court there quoted with approval from Annot., 86 A.L.R.2d 937, 940 (1962):

> "The purpose of the 'drive other cars' provision in an automobile liability policy is to cover occasional or incidental use of other cars without the payment of an additional premium, but to exclude the habitual use of other cars, which would increase the risk on the insurance company without a corresponding increase in the premium."

The court then noted a divergence among other jurisdictions, some of which adopt a test based solely or primarily on the purpose for which the non-owned automobile was furnished. In rejecting that limited measure, the court held that each case should be decided on its own facts with appropriate consideration given to the actual type and length of use and other pertinent facts, all directed to a determination of whether the use and purpose were in harmony with or violative of the non-owned automobile clause.

Representative of a number of cases applying the rationale of *State Farm* are the following:

In *Michigan Mutual Liability Co. v. Stallings*, 523 S.W.2d 539 (Mo.App.1975), the insured was a national guard reservist operating an army truck at the time of the accident. Noting that the evidence did not show regular operation of the truck by Stallings or that his use was habitual, the court found Stallings' policy applicable under the non-owned automobile clause. The

**3.** Although Nadine Junkin unlawfully signed her former husband's name to the title certificate, she had been awarded the car in the marital property division. The former husband, who actually continued as the car's owner, is not recorded here as having ever protested the sale of the Dodge to Sell.

*State Farm* opinion was cited as authority for considering the extension of coverage to be in harmony with the objective of the policy.

The facts in *Farmers Insurance Co., Inc. v. Morris*, 541 S.W.2d 66 (Mo.App.1976) established that Mrs. Cresson used a 1966 Ford belonging to her son to drive to and from work, for personal shopping and for vacation trips, all during a period of four to five years, whenever Mrs. Cresson wanted to use the car. Referring to the type and length of use test in *State Farm*, the court held that Mrs. Cresson's use of the car was regular and that her operation of her son's car was not covered by non-owned automobile coverage under the Farmers' policy issued to Mrs. Cresson's husband.

Under a similar fact situation, a company car was furnished to one Fuchs for business and pleasure driving in *Allstate Insurance Co. v. Northwestern National Insurance Co. of Milwaukee, supra.* Fuchs and his family used the car as a second car without restriction. Holding that a policy issued to Fuchs on the family car which he did own did not provide coverage on the car furnished by Fuchs' employer, the court cited *State Farm* for the dual propositions that regular family use of the non-owned vehicle and the basic purpose of the Allstate policy insuring only one vehicle prevented extension of the policy to insure for one premium two habitually used automobiles.

In *Kenilworth Insurance Co. v. Cole*, 587 S.W.2d 93 (Mo.App.1979), a friend gave Cole the keys to the friend's car whenever Cole needed the car as a substitute for his own. At times, Cole used his friend's car several days in a week while other weeks would pass without Cole using the car at all. Noting the rule in *State Farm*, the court looked to the actual use which Cole made under the blanket permission extended and held that Cole's policy applied to an accident Cole had while driving his friend's car on an errand. The use which Cole did make of the car was occasional and incidental, not regular or habitual.

A case having some relevance in its analysis is *Obedier v. Kennedy Ford, Inc.*, 23 Ohio App.2d 168, 261 N.E.2d 348 (1970). There, the purchaser of a vehicle while driving the car on the date of purchase was involved in an accident. No certificate of title had been issued, but use of the car was authorized on a temporary basis by a "ten-day license card" furnished "to tide the purchaser over" until legal requirements for ownership transfer were satisfied. The court held that restricted operating privileges implicit in the ten-day card precluded a claim that the purchaser's insurance did not cover operation of the new car as a vehicle temporarily furnished for incidental and occasional use. The court stated:

> "The 'Drive Other Cars' provision is a valuable right to a policyholder and is a valuable selling point to the insurer. * * * It is within the spirit and intention of these policy provisions that occasionally a temporary use of another car will be needed and such temporary use will be covered."

Turning now to the relevant facts of the subject case and applying the tests enunciated in *State Farm Mutual Insurance Co. v. Western Casualty and Surety Co., supra,* the purpose for which the non-owned automobile was furnished and the type and length of actual use, certain necessary conclusions emerge. Sell's unrestricted access to the Dodge eliminates measurement of purpose by third party control and requires evaluation of Sell's apparent purpose in acquiring the vehicle.

Although the Dodge was in Sell's possession for nearly one year and was apparently operable, he made no use of the car whatever, save on the two isolated occasions when he first drove the car home after buying it and when he had the accident almost one year later. This lack of use coupled with Sell's failure to take any steps to perfect his record title to the car and thus to permit licensing of the vehicle for its legitimate operation on public streets compel the conclusion that Sell did not acquire the Dodge with the purpose of using it as a means of conveyance. Alternatively, Sell's failure to drive the car at all for almost one year may be attributed to the fact that the car was

452

unlicensed and therefore could not be driven lawfully. This restriction, even if self imposed, is rationally to be equated with those cases in which regular use is prohibited by a third party owner who withholds the keys to the vehicle or otherwise limits the borrower's use. Under the purpose test of *State Farm*, the Dodge was not furnished or available to Sell for regular use.

The second prong of the test, the actual use made of the non-owned automobile, reinforces the conclusion that the Dodge was not available for Sell's regular use. During the extended period of time preceding the accident, the car remained parked and, consistent with this non-use, Sell made no effort to add the car to his insurance policy for the obvious reason that he was not driving the car. The one instance when Sell did drive the Dodge and had the accident was an isolated occurrence, precisely the occasional or incidental use which is in harmony with and is intended to be covered by the non-owned automobile coverage provision of the policy. In this regard it is significant to note that the non-owned automobile insurance feature of the policy is not an exclusion but is an aspect of the insurance coverage for which the company presumably charges a premium. Where, as here, the use made of the non-owned car is an infrequent or casual use for some limited purpose and is not a permanent or reoccurring use, the policy must be construed as affording the coverage for which the insured has purchased the contract and paid his premium.

The judgment is reversed and the cause is remanded with directions to enter a declaratory judgment in accordance with the views here expressed.

All concur.